**Richard ABRAZINSKI, Plaintiff,**

v.

**Larry DUBOIS, et al., Defendants.**

**Civ. A. No. 93–10640–JLT.**

United States District Court,
D. Massachusetts.

Jan. 9, 1995.

---

Richard Abrazinski, pro se.

Rosemary C. Scapicchio, Boston, MA, for plaintiff.

Charles M. Wyzanski, Boston, MA, Terrance J. Brennan, Francis E. Ackerman, Atty. General's Office, Augusta, ME, for defendants.

### .*MEMORANDUM*

TAURO, Chief Judge.

Plaintiff Richard Abrazinski is a Maine prison inmate serving a ten year sentence for burglary and other charges. A portion of his confinement was served in the Massachusetts Department of Corrections facilities. He brings this suit against numerous defendants, for claims which stem from events occurring in the Massachusetts prison system.

Presently before the court is Defendants' Motion for Partial Summary Judgment.

## I.

### Background

Richard Abrazinski was convicted in Maine of burglary and six other state charges. He was sentenced to a ten year term of imprisonment. Abrazinski began his confinement in the Maine prison system. On May 31, 1991 he was transferred to the Massachusetts Department of Corrections on suspicion of having conspired to orchestrate a prison uprising.

Abrazinski's transfer was made pursuant to the New England Interstate Corrections Compact (the "Compact"), enacted into law in both Maine, 34 M.R.S.A. § 1351 (1962), and Massachusetts, G.L. c. 124 App. § 1–3 (1962). The Compact provides that inmates may be transferred between states for confinement. It is implemented by various contracts between the two states.

Upon his transfer, Abrazinski was housed at the Massachusetts Correctional Institution at Cedar Junction ("MCI–Cedar Junction"), a maximum security prison. While at MCI–Cedar Junction, Abrazinski was suspected of stabbing a fellow inmate. On February 4, 1992, he was transferred to the Receiving Building at the Massachusetts Correctional Institution at Norfolk ("MCI–Norfolk") to await a hearing on these charges. At MCI–Norfolk, another incident occurred which resulted in Abrazinski's forcible removal from his cell by the prison extraction team.[1] Abrazinski claims to have suffered injuries during this event.

A hearing on the stabbing incident was conducted at MCI–Norfolk. Abrazinski was found guilty and sentenced to two years at the Department Disciplinary Unit ("DDU") at MCI–Cedar Junction. He began his sentence on November 27, 1992, but was returned to Maine on July 8, 1993.

## II.

### Analysis

Abrazinski filed a 30 page *pro se* complaint[2] stating allegations against numerous defendants.[3] The Department has broken down the assertions into the following six counts: 1) that the Compact and its implementing contract were violated by the application of Massachusetts disciplinary rules to Plaintiff as a Maine inmate; 2) that the application of Massachusetts disciplinary rules to a Maine inmate offended constitutional equal protection and the Massachusetts isolation statute; 3) that conditions in the Receiving Building violated his rights under the Constitution and state law; 4) that Plaintiff's due process rights were violated when inmate witnesses from other institutions were excluded from his disciplinary hearing and allowed to testify by affidavit only; 5) that his Eighth Amendment rights were violated when he was tear gassed and forcibly extracted from his cell; and 6) that his Eighth Amendment rights were violated by the failure to promptly diagnose and treat a fracture of his ring finger. Since Plaintiff has not objected to Defendants' characterization of the case, the court will proceed under this structure.

---

1. Abrazinski alleges that a guard purposefully spilled hot soup on his hand. The guard claims that Abrazinski shoved the hot soup at him. Abrazinski was then ordered to step to the bars of his cell for removal. He refused, was sprayed with tear gas, and removed. During the extraction Abrazinski suffered a broken finger and an adverse reaction to the tear gas. This issue is not presently before the court.

2. Plaintiff has since acquired counsel.

3. Plaintiff sues the following Defendants individually and in their official capacities:
 Larry DuBois, Massachusetts Commissioner of Corrections; Donald L. Allen, Maine Commissioner of Corrections; Ronald Duval, Cedar Junction Superintendent; Martin Magnusson, Warden of Maine State Prison; Peter Pepe, Norfolk Superintendent; James T. Walsh, Manager, Massachusetts Department of Corrections; Donna Phillips, Disciplinary Officer; Donna Carrier, Norfolk Disciplinary Officer; Anthony Silva, Hearing Officer; Kenneth Mahtesian, Hearing Officer; Martin Leonard, Hearing Officer; Unknown Officers, Doctors and Nurses.

 Because the instant Motion only pertains to events involved with the disciplinary hearings at the Department of Corrections, the Defendants will simply be referred to as the "Department".

Defendants contend that counts 1, 2 and 4 can be disposed of on summary judgment.[4] For the reasons below, the Defendants' Motion for Summary Judgment will be granted in part and denied in part.

### A. The Alleged Violation of the Compact and Implementing Contract.

The Plaintiff was accused of stabbing a fellow inmate while in the custody of the Massachusetts Department of Corrections. The hearing on this incident was held at MCI–Norfolk, under the rules and procedures of the Commonwealth of Massachusetts. Plaintiff contends that this was error arguing that, because he is a transferred prisoner, any disciplinary proceedings brought against him must proceed under the rules of the transferor state, Maine. The Department, on the other hand, asserts that Massachusetts rules are applicable to violations of the Massachusetts disciplinary code occurring within the Massachusetts prison system, regardless of the status of the inmate.

■ Plaintiff's claim of a violation of the Compact is, in essence, a claim under 42 U.S.C. § 1983. See Stewart v. McManus, 924 F.2d 138, 141 (8th Cir.1991). In order for an inmate to assert a due process claim cognizable under § 1983 there must be mandatory language limiting prison officials' discretion. Id. (citing Olim v. Wakinekona, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983)). The Department argues that nothing in the Compact or its implementing contract mandate that the transferee state apply the laws of the transferor state when conducting a hearing on alleged violations of the transferee state's disciplinary code. Plaintiff, on the other hand, points to language in the Compact stating that a transferred prisoner remains "subject to the jurisdiction of the sending state" and "is not to be deprived of any legal rights which [he] would have if confined in . . . the sending state." M.G.L. c. 125 App. § 1–2 Article 4(c).

The issue in this case is identical to that resolved by the Eighth Circuit in Stewart v. McManus, 924 F.2d 138 (8th Cir.1991).[5] The Eighth Circuit held that the Compact did not bar the use of local rules in a disciplinary hearing. Id. at 141. The plaintiff in Stewart attempted to rely on the same language as the Plaintiff. This provision, stated above, merely confirms that transferor state has not relinquished its control over the prisoner. Requiring the Plaintiff to be subject to the rules and procedures of the transferee state does not affect that power.

■ In addition, the procedures followed by the Department do not offend the clause in the Compact which protects those rights guaranteed by the transferor state. See M.G.L. c. 125 App. § 1–2 Article IV(e).[6] Neither the disciplinary proceedings held at MCI–Norfolk nor the subsequent punishment meted out deprive Plaintiff of rights he would have had if he had remained in Maine.[7] The inmate's rights implicated in the instant case are those arising under Massachusetts law, not Maine law. This is so because Plaintiff was prosecuted for violating Massachusetts disciplinary rules at a Massachusetts facility. Massachusetts merely treated Abrazinski "equally with similar inmates."

The Eighth Circuit relied instead on language reading "[t]he Compact provides that all transferred prisoners 'shall be treated in a

---

4. The Maine defendants are only implicated by Count 1, the alleged violation of the Compact. Accordingly, as to them, the instant Motion is for full summary judgment.

5. In Stewart, the Eighth Circuit was interpreting the Interstate Corrections Compact. It appears, however, that the relevant language is identical to that of the New England Interstate Corrections Compact. The only differences arise in the language of the implementing contract.

6. Article IV(e): ". . . The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which said inmate would have had if confined in an appropriate institution of the sending state."

7. This clause would be applicable if, for example, the transferor state provided for parole review hearings every six months, whereas the transferee state only provided review hearings once a year. If that were the case, the a transferred inmate would be entitled to receive a hearing every six months, regardless of his presence in the transferee state and regardless of the fact that prisoners of the transferee state would only receive a hearing once a year.

reasonable and humane manner and shall be treated equally with such similar inmates of the receiving state as may be confined in the same institution.'" *Id.; see* M.G.L. c. 125 App. § 1–2 Article IV(e). It interpreted this as requiring the transferee state to treat the visiting prisoner as if he were an inmate of the transferee state subject, therefore, to the same regulations and procedures as other prisoners in the transferee state system. Although the concern motivating the inclusion of such language was, no doubt, to protect against harsher treatment being meted out to foreign prisoners, the result is the same. A transferred prisoner is subject to the same disciplinary rules and regulations as all other inmates within the state.

■ Plaintiff also pointed to M.G.L. c. 125 App. § 1–2 Article IV(f) in order to support his claim. This clause reads:

> Any hearing or hearings to which an inmate confined pursuant to this compact may be entitled *by the laws of the sending state* may be had before the appropriate authorities of the sending state, or of the receiving state if authorized by the sending state.... In the event such hearing or hearings are had before officials of the receiving state, *the governing law shall be that of the sending state*.... (emphasis added).

This clause is not relevant here. The hearings were not held pursuant to the laws of the sending state. They were to remedy serious violations of Massachusetts disciplinary rules and were, therefore, properly governed by Massachusetts law. Without clear language mandating the opposite result, this court will not deny Massachusetts the right to administer its own rules to vindicate violations of its own laws.[8]

The court finds, therefore, that nothing in the Compact mandates that the transferee state apply the transferor state's procedures in a disciplinary hearing on the alleged violation of the transferee state's rules.

■ Finally, the court has reviewed the implementing contracts between Massachu-

setts and Maine. These, too, are devoid of any language that would mandate the use of the transferor state's rules in the transferee state's disciplinary hearings. The original contract, signed on November 5, 1964, contains a section entitled "VIII. *Rights of Inmate.*" This section pertains to rights which "the State of Maine shall extend ... to an inmate transferred from the Commonwealth of Massachusetts." These rights include the right to consult with an attorney and the limitation of any isolation to fifteen days in accordance with the Massachusetts "isolation statute". M.G.L. c. 127 § 40. Nothing in the contract places a similar onus on Massachusetts. The court interprets this as evidence of the states' intent that transferred prisoners be subject to all remaining laws and regulations of the receiving state.

Another contract, signed June 4, 1993 and submitted by Plaintiff, contains a section entitled "15. *Laws and Regulations.*" This section states that:

> Inmates, while in the custody of the receiving state, shall be subject to all the provisions of law and regulations applicable to persons committed for violations of law of the receiving state which are not inconsistent with the sentence imposed.

The sentence received by the Plaintiff is not inconsistent with that imposed by the State of Maine. Section 21 of this contract reads:

> 21. *Discipline.* The receiving state, as agent for the sending state, shall have power to exercise disciplinary authority over all inmates from sending states. However, nothing contained herein shall be construed to authorize or permit the imposition of *a type of discipline prohibited by the laws of the sending state.*" (emphasis added).

Plaintiff has not submitted evidence that the confinement at DDU is of a type that is prohibited by Maine. Plaintiff may have received a longer punishment than he would have gotten in Maine, but this is not precluded by the contract.

---

8. Plaintiff also cites *Opinion of the Justices,* 344 Mass. 770, 184 N.E.2d 353 (1962). This was an advisory opinion of the Supreme Judicial Court which stated that federal law did not prohibit the implementation of the Compact. The justices made no effort at interpreting the Compact.

In light of the above, Plaintiff's claim that "both the Compact and the contract make it clear that no sanctions shall be issued by a receiving state that could not have been issued by the sending state," (Plt.Mem.Opp.Summ.J. at 5), is too broad an interpretation of the relevant documents. The court, therefore, finds that the use of Massachusetts law to vindicate a violation of Massachusetts disciplinary rules did not violate the Compact or the contracts and did not infringe on Plaintiff's fourteenth amendment liberty interests.

### B. Plaintiff's Equal Protection Claim and the Alleged Violation of Massachusetts G.L. c. 127 § 40.

■ Plaintiff did not press his equal protection argument in his opposition brief. Understandably, it would be difficult to define a relevant class in such a way that an equal protection claim could survive. Plaintiff has no right to remain in the custody of Maine officials. *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983). Since he is, therefore, rightfully in the custody of the Massachusetts Department of Corrections, he must expect to be treated equally with other Massachusetts inmates.

■ Plaintiff also asserts that the two year sentence at the DDU violates M.G.L. c. 127 § 40, which limits confinement in an "isolation unit" to no more than fifteen days. There is no evidence on this record, however, that the DDU is an isolation unit.

The statute itself does not define the term. Numerous plaintiffs, however, have attempted to equate the DDU with an isolation unit in both the federal and state courts. No court has issued the requested preliminary relief and no decision has been rendered in favor of the inmates. *E.g., Garcia v. DuBois*, C.A. No. 92–2168 (Sup.Ct. Suffolk Cty.); *Geas v. Mahtesian*, C.A. No. 92–4879 (Sup.Ct. Suffolk Cty.); *Guyton v. Rapone, et al.*, C.A. No. 92–13070–W (D.Mass.).

Although the DDU is a confined and segregated environment, it allows regular, though brief, contact with other inmates, access to books, and after a sufficient period of good behavior, social visits, telephone calls and a radio. (Def.Mem.Sup.Summ.J. at 10). This differs from conditions contemplated by the isolation statute.[9]

### C. Plaintiff's Due Process Claims and Alleged Violations of the Code of Massachusetts Regulations.

Plaintiff alleges that his due process rights were violated when he was deprived of the opportunity to call witnesses at his disciplinary hearing. Defendants move for summary judgment on this count claiming both that the denial of Plaintiff's request for witness was proper and, in the alternative, that the Plaintiff never requested witnesses in first place.

■ The Department's Motion, however, fails to meet the requirements of the district's Local Rules. Local Rule 56.1 states "Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried...." Loc.R. 56.1. "Failure to include such a statement constitutes grounds for denial of the motion." *Id.* The Defendants' Motion for Summary Judgment failed to include such a statement.[10] As discussed below, this failure has resulted in both confusion for the court and possible prejudice to the opposing party. The Defendants' Motion for Partial Summary Judgment, insofar as it goes to Plaintiff's claims of procedural de-

---

9. The statute mandates that any isolation unit provide "light, ventilation and adequate sanitary facilities, may contain a minimum of furniture, and shall provide at least one full meal daily." § 40 ¶ 2. These minimum requirements suggest that an "isolation unit", as contemplated by the statute, is a more severely limited environment than the DDU.

10. The court notes that the Motion also failed to adhere to Local Rule 7.1, requiring that "no motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." Loc.R. 7.1(A)(2). At the time they filed the Motion, Defendants' counsel made no effort to contact or confer with counsel for Plaintiff.

fects during the hearings is, therefore, denied.[11]

■ Contrary to the Department's assertion, the Supreme Court's interpretation of the Federal Constitution provides inmates a limited right to call witnesses at a disciplinary hearing. *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 2979–80, 41 L.Ed.2d 935 (1974) The Department's contention that "[a]s a matter of constitutional law, *inmates are not entitled to introduce witnesses or evidence at a prison disciplinary hearing and no explanation need be given as to why*," (Def.Mem.Sup.Sum.J. at 12 (emphasis added)), is simply a mis-statement of the cited case. In *Wolff*, the Court's pronouncement was clear: "[w]e are also of the opinion that *the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense....*" *Id.* at 566, 94 S.Ct. at 2979 (emphasis added). Further, "[a]lthough we do not prescribe it, it would be useful for the [prison officials] to state its reason for refusing to call a witness...." *Id.*

The laws of the Commonwealth of Massachusetts go further than the Court's holding. The Massachusetts Code of Regulations contains the procedures governing disciplinary hearings at Massachusetts Correctional Facilities. 103 CMR § 430.14(4) reads:

"The inmate shall be allowed to call and question witnesses in his defense, ... when permitting him to do so will not be unduly hazardous to personal safety, institutional safety or correctional goals. The factors that the hearing officer may consider when ruling on an inmate's request to call witnesses, questioning of witnesses, or offer of other documentary or physical evidence shall include, but shall not be limited to the following:

. . . . .

c) Hazards presented by an individual case;

. . . . .

e) Failure of inmate to provide a summary of the expected testimony of the proposed witness."

### 1. *Effect of Department's Admissions in Their Answer*

Plaintiff's Complaint alleges that he timely requested two witnesses for each hearing.[12] (Complaint ¶ 30, 46.) The Department admits, in its Answer, that the Plaintiff did so request. The Department also repeated this admission in its Motion for Summary Judgment, arguing that "the denial of the[ ] requests [for witnesses] was well within the Hearing Officers' sound discretion." (Def.Mem.Supp.Sum.J. at 12).

The Plaintiff, however, countered by noting strong analogy to *Kenney v. Commissioner of Correction*, 393 Mass. 28, 468 N.E.2d 616 (1984) (Liacos, J.), indicating that the denial of the request for witnesses and other circumstances may have violated the CMR as interpreted by the Supreme Judicial Court. Although the Department stated in its reply brief that *Kenney* has no relevance to the instant case, the Department apparently reassessed the grounds of its argument. In its reply brief, the Department asserted for the first time, that "[Plaintiff] failed to make a written request within twenty-four hours of receiving notification of the disciplinary hearing." (Plt.Rep.Mem.Supp.Summ.J. at 3).[13]

---

11. The failure to include the statement of uncontested material facts does not prejudice the other issues of the Motion. Pursuant to the court's discretion under the Federal Rules, the Motion will be denied as to this issue only. *See* Fed. R.Civ.P. 56(d).

12. The inmate had two hearings. The first was held in April, 1992. The second, after appeal, was held in August of the same year.

13. The Department relies on one form, entitled "Notice of Disciplinary Hearing," from the Plaintiff's file. This form, however, does not establish that the inmate failed to request witnesses.

The designated form appears to be merely a record of the fact that the department timely and properly notified the inmate of charges brought against him. The first paragraph reads "[y]ou have been charged with a disciplinary offense(s) which has been referred to the hearing Officer for hearing. A description of the offense(s) is contained in the attached Disciplinary Report. A hearing on this Disciplinary Report has been scheduled for:" In the space provided is written "Open Date."

The next paragraph reads, "[i]f you wish to request the presence of the [unintelligible] staff person *or to request other witnesses*, please fill out

Defendants have not explained the inconsistency in their signed pleadings. The court searched for case law on the question of when a party is estopped from denying an allegation admitted to in its answer. It has not found anything directly on point. Unfortunately, the Federal Rules offer little guidance. They simply state that a failure to deny is deemed an admission. Fed.R.Civ.P. 8(d). The Rules don't speak to the preclusive effects of an admission.

■ The purpose of admitting or denying allegations in a complaint is to put the parties on notice of what issues are in dispute. *See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1261 at 382. "[A] defendant's pleading should apprise the opponent of the allegations in the complaint that stand admitted and *will not be in issue at trial and those that are contested and will require proof to be established to enable the plaintiff to prevail.*" *Id.* (emphasis added). *See also Lopez v. U.S. Fidelity & Guar. Co.,* 18 F.R.D. 59 (D.Ak1955) (The purpose of Rule 8(b) regarding answers is to prevent surprise.).

In *Sinclair Refining Co. v. Howell,* 222 F.2d 637 (5th Cir.1955), a wrongful death action, plaintiff alleged that the decedent was not subject to Alabama's Workmen's Compensation Laws. The defendant did not explicitly deny the allegation. The court found that "[i]f the issue of applicability of the Workmen's Compensation Act had been clearly drawn, as required by the rule, the [plaintiff] would have had the opportunity of developing that the deceased [was not technically working for the employer]." Thus, the court held that the plaintiff's allegation concerning the applicability of the Workmen's Compensation Act was deemed to be admitted. Unfortunately, the court did not specify whether the defendant was thereby precluded from arguing to the contrary at later stages.

The severity with which the courts adhere to the rule that failure to adequately deny an allegation results in an admission suggests that an "admission" must carry some weight beyond the pleading. The pronouncements of the various courts that have spoken on this issue appear to apply Rule 8(d) as a punitive measure. The Fifth Circuit noted in *Sinclair* that the resultant loss of plaintiff's opportunity to develop a record on the "admitted" issue "illustrate[s] the wisdom of the rule in requiring issues to be clearly drawn." In the instant case, Plaintiff has already conducted depositions and the parties are preparing for trial. Here, Plaintiff conducted his discovery under the impression that the Department did not deny the fact that witnesses were properly requested. The Department's sudden change in position creates a substantial issue of fact that cries for adequate discovery.

The court is of the impression that the Plaintiff has been greatly prejudiced by the Department's inconsistencies. Plaintiff has been deprived of the opportunity to depose many of the personnel involved. As to those depositions conducted, the Plaintiff had no indication that this very important issue was in dispute and, therefore, would not have pursued this line of questioning.

■ The resolution of this issue should probably be guided by Federal Rule 15(a) governing amendments to pleading. The court will, therefore, treat the Department's shift in arguments as a motion to amend its Answer. Rule 15 outlines a very liberal policy of allowing amendments. A trial court should generally not deny a request to amend, even at the summary judgment stage, unless the court finds that there was bad faith, undue delay or prejudice. *Adams*

---

the *attached* Request For Representation/Witnesses form." The spaces provided for the signature of the inmate and the serving officer are blank.

The final paragraph reads, "[w]hen an inmate has been given copies of the above enumerated documents, but refuses to sign this acknowledgement, the staff person who delivered the documents shall complete the following." In the space provided the staff person attested to the fact that "I personally delivered copies of this Notice, Disciplinary Report and Request for Representation/Witnesses form to Richard Abrazinski and he refused to sign."

This document, therefore, does not represent that the Plaintiff failed to request witnesses. It merely states that he refused to sign the acknowledgment form. As is apparent from the. form, the witness request form is another document.

v. *Gould Inc.*, 739 F.2d 858, 869 (3d Cir. 1984). Further, most circuits have held that delay alone is an insufficient reason to deny a motion to amend. *Hayes v. New England Millwork*, 602 F.2d 15 (1st Cir.1979).

■ On the other hand, it is well within the court's discretion to deny a motion to amend when prejudice results. *Id.* The First Circuit has held that "[P]arties seeking the benefit of the rule's liberality have an obligation to exercise due diligence; unseemly delay, in combination with other factors, may warrant a denial of suggested amendment." *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1517 (1st Cir.1989). Further, while leave to amend "shall be freely given when justice so requires," it may be denied "in the face of extraordinarily long and essentially unexplained delay." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 138 (1st Cir.1985), *cert. denied*, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986). *See also Berger v. Edgewater Steel Co.*, 911 F.2d 911 (3d Cir.1990) (Trial court did not abuse discretion in denying Plaintiff's motion to amend complaint when the amendment would have injected new issues into the case requiring extensive discovery, when the motion came almost five months after information on which it was based became available and after the close of discovery); *Coonce v. Aetna Life Ins.*, 777 F.Supp. 759 (W.D.Mo.1991) (ERISA medical plan participant not allowed to amend complaint to add claims involving matters that were known to the participant at the time she filed the action; there was no excusable reason why the claims were not included in the original complaint).

The court will not decide this issue at this time. Suffice to say, the Departments' Motion for Partial Summary Judgment is denied as to Count IV for Plaintiff's due process claims. Parties should be prepared to brief the issue of why the Department should be allowed, at this late stage in the litigation and without pointing to sufficient supporting evidence, to amend its Answer.

### 2. *The Denial of the Request for Witnesses.*

In the event that the court finds that Plaintiff did timely and appropriately request witnesses, it will then need to review the Department's denial of that request.

Again, contrary to the Department's assertion, the Supreme Judicial Court's decision in *Kenney v. Commissioner of Correction*, 393 Mass. 28, 468 N.E.2d 616 (1984) (Liacos, J.), appears to be on point. In *Kenney*, an inmate was removed from the general prison population and placed in the Department Segregation Unit ("DSU") pending a hearing on disciplinary charges. At the hearing, the Department denied the inmate's request to call witnesses, at least in part because of the inmate's confinement in the DSU.

The Supreme Judicial Court held that the inmate's confinement in the DSU, without first being found guilty by the disciplinary board, was specifically prohibited by the Massachusetts procedures. *Id.* at 33, 468 N.E.2d 616; *see* 103 CMR § 421.07(2). It was, therefore, improper to use the inmate's illegal confinement as a basis for denying his request to call witnesses. *Id.* at 35, 468 N.E.2d 616.

The Department argues that *Kenney* is inapplicable because Plaintiff was not in a segregation unit, but was rather in an "awaiting action" unit. *See* 103 CMR 421.08. The Code does not define either a segregation unit or an awaiting action unit. This determination, therefore, is a question of fact for the court. The Supreme Judicial Court has written that the Department cannot escape the rule of *Kenney* merely by assigning another name to detention unit. *Longval v. Commissioner of Correction*, 404 Mass. 325, 328–29, 535 N.E.2d 588 (1989). *Kenney* described the conditions of the segregation unit at issue.[14] 393 Mass. at 32, 468 N.E.2d 616. These conditions are similar to those de-

---

**14.** The inmate was allowed only two no-contact visits per week and, weather permitting, three one-hour exercise periods per week. He was allowed two showers per week and three changes of clothing. He was not permitted to have a radio or television, but was allowed three magazines, legal materials, correspondence, tobacco and toiletries.

scribed by Plaintiff.[15]

■ The Department's brief also claims that it can deny an inmate's witness request without stating its reasons. This is incorrect. The Massachusetts Code states that "If a guilty finding is reached, the hearing officer shall prepare a written decision containing the following ... (c) an explanation for the exclusion of evidence and witnesses...." 103 CMR § 430.17; *see also Kenney,* 393 Mass. at 35, 468 N.E.2d 616 ("We have held that, in order to render this right meaningful, due process requires that the administrative record contain some support to justify a denial of the right to call witnesses.").

*Kenney* also speaks to the Department's discretion. The opinion notes that "prison administrators have broad discretion in the administration of prison affairs. Such discretion, however, is not unlimited." *Id.* (citations omitted). The court also found that isolation in a segregation unit alone, even if legal, is not sufficient to support a denial of witnesses. *Id.* For instance, at the Walpole facility, where the events in *Kenney* took place, there was a "secure visitation area in which the safety of the witnesses could be assured." *Id.*

Under the holding of *Kenney,* therefore, Plaintiff has the opportunity to argue that the Receiving Building at MCI–Norfolk is properly considered a segregation unit, thereby making his confinement therein illegal. He may also argue that MCI–Norfolk had adequate facilities to allow the presentation of witnesses on his behalf. These questions of fact become relevant if it is found that the Department is estopped from denying that the Plaintiff made timely requests for witnesses or if, after discovery and argument, the court finds that the inmate did so request.

3. *The Department's Use of Informant Information.*

■ Although not raised by the Plaintiff, the court's review of the record has brought to light questionable procedures surrounding the Department's reliance on informants during the hearings.

The use of informant information in disciplinary hearings is governed by 103 CMR 430.15. These rules were altered to accord with the Supreme Judicial Court's decision in *Lamoureux v. Superintendent, Massachusetts Correctional Institution, Walpole,* 390 Mass. 409, 456 N.E.2d 1117 (1983) (Liacos, J.).

In *Lamoureux,* the court ruled that the Department's previous procedures for the use of informant information did not comport with federal due process. The opinion set forth the following requirements:

"[W]hen a disciplinary board's determination is derived from informant information, (1) the record must contain some underlying factual information from which the board can reasonably conclude that the informant was credible or his information reliable; (2) *the record must contain the informant's statement [written or as reported] in language that is factual rather than conclusory* and (3) must establish by its specificity that the informant spoke with personal knowledge of the matters contained in such statement." *Id.* at 414, 456 N.E.2d 1117. (emphasis added).

The Code of Massachusetts Regulations was changed to read:

430.15: *Procedures for the Use of Informant Information*

In disciplinary cases involving informant information, the hearing officer may consider documentary evidence and/or testimony which is not presented in the presence of the inmate or his representative only if, after viewing and/or hearing such documentary evidence or testimony the hearing officer has:

(1) Made a finding that the informant is reliable and that the information is credible. This finding shall be included in the record and should contain the following information:

---

**15.** Plaintiff's Complaint alleges that during his first three weeks at the Receiving Building at MCI–Norfolk he had no change of clothing, no access to a telephone or recreation and minimal access to hygiene. After being formally made aware of his charges, he was permitted one 20 minute phone call per week and outdoor recreation.

(a) the facts upon which the hearing officer based his conclusion that the informant was reliable and that the information was credible.

(b) *a statement of the information provided by the informant as specific as is possible without creating a substantial risk of disclosing the identity of the informant.* The statement should demonstrate that the informant had personal knowledge of the information he provided;

(2) Made a finding that the disclosure of the documentary evidence or testimony provided by the informant to the inmate or his representative would create a substantial risk of harm to the informant, to any other person, or to the security of the institution;

(3) *The hearing officer shall present a summary of the informant information to the inmate at the hearing.* Such presentation may, however, be forgone in cases where the disclosure of the information in any greater detail *than that which is contained in the disciplinary report* itself would create a substantial risk of disclosing the identity of the informant.[16]

103 CMR 430.17(2) also adds: "Where the hearing has involved the use of informant information, the statement of the evidence shall be set out in accordance with 103 CMR 430.15." .

Although the regulations allow the Department to limit the statement of the informant information to protect the informant, it does not allow the Department to do away with the statement completely. *Lamoureux* is explicit on this point, simply stating that the inmate must receive a statement of the infor-

mant's testimony. *Lamoureux*, 390 Mass. at 414, 456 N.E.2d 1117. That court realized that a full statement may not be practicable under the circumstances. Further it did not require an *in camera* examination of the informant. *Id.* at 416, 456 N.E.2d 1117. Nevertheless, the Supreme Judicial Court cautioned that "where cross-examination and confrontation are not available to sift out the truth, such guidelines are important to ensure that the hearing by the board was a genuine fact finding procedure verifying the truth of the wrongdoing." *Id.* at 415, 456 N.E.2d 1117.

 The record before the court does not contain any summary of the informant information. The only information regarding the informant testimony is on the "Informant Information Checklist" (the "Checklist").[17] These specifically state that no summary was given to the inmate. This is in direct opposition to the requirements set out in *Lamoureux* and the Massachusetts Code.[18] Both mandate that some summary be provided both to the inmate and in the record.

As a result, there is nothing in the record for judicial review of the informant information. *See Nelson v. Commissioner of Correction*, 390 Mass. 379, 396, 456 N.E.2d 1100 (1983) (Liacos, J.) ("For purposes of judicial review, *the record must contain some facts from which the court can reasonably conclude that the board inquired and found the informants and their information to be reliable.*") (emphasis added). The Checklist does show *why* the Hearing Officer found the informants to be reliable—it states whether and how many times the informants were used, whether the informants have personal knowledge of the information, etc. There is,

**16.** Note that the second sentence of ¶ 3 contemplates that the inmate will already have received a summary of the testimony in the disciplinary report.

**17.** The purpose of the Checklist is to record the findings made by the Hearing Officer in determining that the informant information was reliable. The form asks whether the Hearing Officer believes that the informant would be put at risk if the accused were given the information. It proceeds to ask questions regarding the reliability of the informant, such as whether the informant has been used before, how many times, and

whether the informant asked for favors in return for the information. Finally, it asks whether the accused inmate or his legal representative was given a summary of the informant information.

**18.** The Checklist asks whether a summary of the informant information has been given to the inmate. This anticipates that the disciplinary officer has the discretion not to give a summary to the inmate. In fact, in the instant case, all checklists state that the inmate did not receive a summary of the informant information used against him.

however, no way for a reviewing court to discern whether the information was factual or conclusory, whether it reasonably supported the conviction, or whether the informant actually exists. The procedures, as applied in this case, do not allow for even the slightest measure of substantive judicial review.

The present case illustrates why a more substantive review of informant information is necessary. The Plaintiff received two hearings, the first in April of 1992 and the second, after appeal, in August. The record has a total of six Checklists, three used in the first hearing and three in the second. The ones for the rehearing, however, *are from three new informants.*[19] It appears, therefore, that in the four months between the appeal, the Department lost three informants and found three more. Such coincidence requires some explanation.

■ There are other problems with the Checklists. The three from the first hearing state that the inmate had been given a summary of the informant information and that a copy of the summary is attached. But, the informant did not receive a copy of the information, and there is no summary in the record. The Checklists for the second hearing, on the other hand, state that no summary was given to the inmate. Also, the Checklist for Informant C states that it "cannot answer" the question of whether the informant had personal knowledge of the information. To use this informant, therefore, directly contradicts the requirements of *Lamoureux,* which mandates that the record "must establish by its specificity that *the informant spoke with personal knowledge of the matters contained in such statement.*"

Finally, a careful review of the record brought to light other events calling into

question the soundness of the conviction. The record does not contain a copy of the Hearing Officer's Decision from the first hearing, as required by 103 CMR 430.17. The Decision from the re-hearing is undated and unsigned. The Plaintiff was found guilty of "killing", even though the victim did not die. The Plaintiff was denied his request for a copy of the tape recording from the first hearing in order to prepare for the second, an apparent violation of the Code.[20] And, the Plaintiff was denied without explanation the opportunity "present evidence" by calling, at the second hearing, a state trooper who had testified at the first hearing.[21]

Together, these reasons are sufficient to create a question of whether the hearings in this case comport with the requirements of due process and the Massachusetts Code.

### III.

### *Conclusion*

For the foregoing reasons, the Defendants' Motion for Summary Judgment is ALLOWED in part and DENIED in part.

An order will issue.

---

**19.** This can be determined by matching the number of times each informant had been given information previously. For example—Informant A from the first hearing has given information "over 12" times. Three months later, the most prolific informant had only been dealt with "ten or more times". Informant B had never given information before the first hearing. One informant from the rehearing was used once before, so it is possible that informant B was used in the interim between the first and second hearing. Informant C was used "Approx. 6" times before

the April hearing. The remaining informant from the re-hearing, however, was only used 3 times. It would be impossible, therefore, for them to be the same person. From the numbers it appears safe to assume that none of the informants used for the second hearing are the same as those used in the first.

**20.** 103 CMR 430.12(3).

**21.** 103 CMR 430.17.