USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS  FOR THE FIRST CIRCUIT ____________________ No. 95-1479 BRENDAN MCGUINNESS, Plaintiff, Appellee, v. LARRY E. DUBOIS, ET AL., Defendants, Appellants. ___________________ No. 95-1480 BRENDAN M. MCGUINNESS, Plaintiff, Appellant, v. LARRY E. DUBOIS, ET AL., Defendants, Appellees. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Selya, Stahl and Lynch, Circuit Judges. ______________ ____________________ Brendan M. McGuinness on brief pro se. _____________________ Nancy Ankers White, Special Assistant Attorney General, and ____________________ Philip W. Silva, Department of Correction, on brief for appellees, ________________ Larry E. Dubois, et al. ____________________ February 12, 1996 ____________________ Per Curiam. The defendants, John Treddin, a ____________ disciplinary hearing officer at Massachusetts Correctional Institute - Cedar Junction (MCI-CJ) and Ronald Duval, the superintendent at MCI-CJ, appeal the grant of a declaratory judgment in favor of inmate Brendan McGuinness. McGuinness cross-appeals the grant of summary judgment on the ground of qualified immunity in favor of the defendants on his claims for damages. We reverse the declaratory judgment in favor of McGuinness and affirm the summary judgment on the damages claims. I. In November 1991, McGuinness got into an altercation with a prison guard, Sergeant John Andrade, and was charged with various prison disciplinary code violations, including being out of place, disrupting the security or orderly running of the institution, fighting and use of abusive language. A few days later, McGuinness was notified of a disciplinary hearing and moved to MCI-CJ's West Wing Segregation Unit ("West Wing").1 He was placed in the upper  ____________________ 1. The West Wing is comprised of two sections. The two upper tiers are denominated as the "Awaiting Action Unit" ("AAU"). The AAU is a secure holding area for an inmate while he is awaiting a disciplinary hearing. The lower tiers of the West Wing are the Departmental Segregation Unit ("DSU"). According to prison regulations, an inmate may be placed in the DSU only after a finding by the Commissioner of Correction (or his designee) based on substantial evidence that, if confined in the general population, the inmate poses a substantial threat (i) to the safety of others, (ii) of damaging or destroying property, or (iii) to the operation of -2- tier of the West Wing, i.e., in the AAU. McGuinness' disciplinary hearing was held in the West Wing on January 9, 1992. Both McGuinness and Andrade testified and Andrade submitted his written report. McGuinness admitted that he argued with, used foul language toward, and struck Andrade, but claimed that he was provoked when Andrade pushed him. Andrade acknowledged that he pushed McGuinness away when McGuinness got right up in his face. McGuinness' request to call three inmate witnesses from the general population, (who he alleged were eyewitnesses), was denied "for security reasons." However, Officer Treddin considered their written affidavits. Ultimately, Treddin deemed the three affidavits "non-credible" because in Treddin's opinion all three inmates saw the confrontation only in part. Treddin found McGuinness guilty based on McGuinness' own admissions and Andrade's written report and testimony. Treddin imposed a sanction of 30 days in isolation and recommended that McGuinness lose 100 days of good-time credit. McGuinness appealed the matter to defendant Superintendent Duval, claiming, inter alia, that Treddin wrongfully portrayed McGuinness as the aggressor and wrongfully denied his request for witnesses due to McGuinness' placement in the West Wing. He argued that his  ____________________ the correctional facility. Mass. Reg. Code tit. 103,  421.09 (1990). -3- -3- witnesses "would have been able to explain what they saw much better if given a chance to give an oral testimony." Duval denied McGuinness' appeal. Eventually, the incident was referred to the DSU board and, pursuant to a finding, based on this November 1991 incident and a subsequent incident or incidents in January 1992, that McGuinness presented a substantial threat to the safety of others, McGuinness received a two year sentence of confinement to the DSU (in addition to the sanction of 30 days in isolation and loss of 100 days of good-time credit). II. In November 1993, McGuinness filed an action in the district court, pursuant to 42 U.S.C. 1983, naming Officer Treddin and Superintendent Duval as defendants (as well as other prison officials not pertinent here). McGuinness' complaint raised several claims, most of which are not involved in these cross-appeals. The counts which remain relevant are these: Count 2 alleged that Treddin violated McGuinness' right to due process. In particular, McGuinness alleged that he had been unlawfully transferred to the West Wing prior to any guilty finding and that Treddin used this alleged illegal placement in the West Wing as the sole reason for denying his request for witnesses. Count 4 alleged that Superintendent Duval violated McGuinness' right to due process by denying his appeal without any explanation. -4- -4- McGuinness asked for compensatory and punitive damages on these claims. In Count 6 McGuinness requested a declaratory judgment that his placement in the West Wing was illegal and the denial of witnesses due to his placement there violated due process. The parties cross-moved for summary judgment. In a memorandum and order, dated March 15, 1995, the district court concluded that genuine issues of material fact existed as to whether (a) McGuinness' placement in the AAU constituted an unlawful placement in a segregation unit prior to a guilty finding, the imposition of sanctions, and the appropriate finding of "substantial threat" by the Commissioner; and (b) Treddin's refusal to allow McGuinness to call witnesses violated "the rule of Kenney [v. ______ Commissioner of Correction, 393 Mass. 28 (1984)]." The ____________________________ court, therefore, declined to enter a declaratory judgment, as requested in Count 6, in any party's favor. The court did conclude, however, that the state of the law on this issue was confused and, thus, Treddin and Duval were entitled to summary judgment on the ground of qualified immunity on McGuinness' damages claims -- Count 2 (Treddin) and Count 4 (Duval).2  ____________________ 2. The district court construed Count 4 as a claim against Duval, not on the basis of respondeat superior (which would not lie, pursuant to 1983, in any event), but as a claim that Duval was personally liable for failing to take remedial action after learning of the alleged due process violation -5- -5- Count 6 then went to a one-day bench trial at which Officer Treddin testified. The court's findings of fact and rulings of law can be found at McGuinness v. Dubois, 887 F. __________ ______ Supp. 20, 21-23 (D. Mass. 1995). In brief, the court ruled that the AAU is not a DSU. Thus, the court rejected McGuinness' initial premise, i.e., that his placement in the AAU constituted an unlawful placement in the DSU prior to the required findings by the Commissioner. Nonetheless, the court held that McGuinness was "not given the protections afforded him by Department of Correction regulations" as interpreted by Kenney and subsequent caselaw. The court ______ declared that Treddin's determination must be set aside and that the rulings that followed the disciplinary hearing are void and of no effect and may play no part whatsoever in any further classification, penal, disciplinary, or release decisions with respect to McGuinness. As noted at the outset, Treddin and Duval appeal this declaratory judgment and McGuinness cross-appeals the March 15 summary judgment denying his claims for damages. III. In Wolff v. McDonnell, 418 U.S. 539 (1974), the Court _____ _________ held that a state-created right to good-time credit for satisfactory behavior, forfeitable only for serious  ____________________ through McGuinness' appeal following the disciplinary hearing. Thus construed, the district court found Duval, nonetheless, entitled to qualified immunity. -6- -6- misbehavior, is a sufficient liberty interest within the Fourteenth Amendment to entitle the inmate to "those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." Id. at 557.3 In ___  ____________________ 3. Recently, the Court, in Sandin v. Conner, 115 S. Ct. 2293 ______ ______ (1995), refocused the due process inquiry away from the parsing of the mandatory/discretionary language in prison regulations and back to the nature of the deprivation, i.e., whether the restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or "will inevitably affect the duration of his sentence." Id. at 2299-302. In Sandin, the Court ___ ______ concluded that solitary confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. Id. at 2301. Nor did ___ it inevitably affect the duration of Conner's sentence. Id. ___ at 2302. Sandin, however, did not retreat from Wolff's holding ______ _____ that, if a state statutory provision created a liberty interest in a shortened prison sentence which results from ________________________________ good-time credits, revocable only if the inmate is guilty of serious misconduct, that inmate is entitled to the procedural protections outlined in Wolff. Id. at 2297; see also Gotcher _____ ___ ________ _______ v. Wood, 66 F.3d 1097, 1110 (9th Cir. 1995) (opining that ____ Wolff's due process principles remain applicable in the _____ context of revocation of statutory good-time credits after Sandin). ______ Massachusetts has a statutory provision, Mass. Gen. L. ch. 127, 129, awarding a good conduct deduction from an inmate's maximum imprisonment term, forfeitable for violations of prison rules. And, in the instant case, as a result of the guilty finding on the disciplinary charge, McGuinness forfeited 100 days of good-time. McGuinness, therefore, was entitled to the procedural protections of the Due Process Clause prior to the revocation of his statutory good-time credits. (Although Mass. Gen. L. ch. 127, 129 was repealed on July 1, 1994, the repealing provision also provided that the law in effect at the time an offense is committed governs sentencing for that offense, i.e., the repealed section still applies to McGuinness, whose offense was committed prior to July 1, 1994.) As explained in greater detail, infra, the issue in _____ these appeals is what process was due McGuinness at his -7- -7- Wolff, the Court determined that, at a minimum, due process _____ entitled an inmate, facing a disciplinary hearing, to (1) advance (no less than 24 hours) written notice of the claimed violation, (2) a qualified right to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals, and (3) a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken. Id. at 563-67. ___ These cross-appeals concern the second of these due process requirements -- the parameters of the inmate's qualified right to call witnesses. The district court found, and the defendants do not dispute, that MCI-CJ has an institutional policy of denying an inmate's request to call inmate witnesses from the general population at a disciplinary hearing held in the West Wing.4 This policy is based on the heightened security requirements in the West Wing, which houses inmates with a demonstrated proclivity for violence and disruption, and on the resulting effect that bringing witnesses into the West Wing has on the allocation of corrections officers there and in the rest of the prison.  ____________________ disciplinary hearing under federal constitutional law. _______ 4. The court also found, however, that there were occasions, although rare, when a disciplinary hearing involving an inmate housed in the West Wing had been moved outside that wing. -8- -8- Any inmate entering the West Wing from the general population has to be strip-searched and accompanied by two correction officers; restraints are required to move inmates within the West Wing; and restraints may, or may not, be used in the presence of hearing officers at disciplinary hearings. The court held that the Kenney decision, i.e., "the rule ______ of Kenney," and subsequent caselaw prohibits the denial of ______ witnesses' testimony simply based on an inmate's location in the West Wing and that the caselaw and the prison regulations require an individualized assessment that calling a particular witness would be unduly hazardous to institutional safety or correctional goals. The court found that no individualized assessment occurred in McGuinness' case and thus McGuinness was not given the protections afforded him by the regulations as interpreted by Kenney and its progeny. ______ To a large extent, however, Kenney was simply an ______ interpretation of the requirements of state law. In Kenney, _________ ______ inmate Kenney had been transferred to the DSU prior to his __________ disciplinary hearing on assault charges and confined there under the same conditions as those inmates transferred to the DSU pursuant to a finding by the Commissioner that their behavior posed a substantial threat to the residents, property, or operations of the institution. Kenney v. ______ Commissioner of Correction, 393 Mass. at 29. At his ____________________________ disciplinary hearing, Kenney's request that the two alleged -9- -9- victims (both inmates in the general population) be allowed to appear as witnesses was denied. Kenney subsequently brought an action in state court and on appeal the SJC found that the prison officials had violated their own regulations, which have the force of state law, by placing Kenney in a DSU cell for committing a disciplinary offense before Kenney had been found guilty, before sanctions had been imposed, and before the Commissioner had found that Kenney posed a substantial threat to the institution. Id. at 33-34. As ___ Kenney was illegally incarcerated in the DSU, the court rejected the prison officials' attempt to justify their denial of his request to call witnesses on basis of his location in the DSU. Id. at 35. ___ To the extent that "the rule of Kenney" is solely a rule ______ of state law, it has no application in this 1983 action claiming a deprivation of McGuinness' rights secured by the federal Constitution and laws.5 "Federal constitutional standards rather than state statutes define the requirements of procedural due process." Russell v. Selsky, 35 F.3d 55, _______ ______ 60 (2d Cir. 1994) (internal quotation marks and citation omitted). "The failure of the [disciplinary] board to comply with its own regulation would constitute a denial of due  ____________________ 5. To the extent that the prison officials arbitrarily violated their own state law regulations, it would appear that McGuinness could have pursued state judicial review. See Sandin v. Conner, 115 S. Ct. at 2302 n.11. ___ ______ ______ -10- -10- process if the regulation were mandated by the Constitution or federal law." Domegan v. Fair, 603 F. Supp. 360, 364 (D. _______ ____ Mass. 1985); see also Olim v. Wakinekona, 461 U.S. 238, 250- ________ ____ __________ 51 (1983) ("The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right.") (Footnote omitted). "The rule of Kenney," therefore, is ______ relevant to McGuinness' 1983 action only to the extent that Kenney accurately recites the parameters of federal due ______ process. The SJC did consider whether Kenney's due process rights were violated by the denial of his request to call certain witnesses. Kenney v. Commissioner of Correction, 393 Mass. ______ ___________________________ at 34. But that determination was based on its conclusion that due process requires some support in the administrative record to justify the denial and none was found in Kenney's case. Id. at 35, citing Real v. Superintendent, Mass. ___ ______ ____ _____________________ Correctional Inst., Walpole, 390 Mass. 399, 407 (1983). ____________________________ However, the Supreme Court has since held that due process does not require that support for the denial of witnesses ___ exist as part of the administrative record; rather prison officials may satisfy due process by presenting testimony in court if the deprivation of a liberty interest is challenged because of that claimed defect in the hearing. Ponte v. _____ -11- -11- Real, 471 U.S. 491, 496-97 (1985), vacating and remanding, ____ _______________________ Real v. Superintendent, Mass. Correctional Inst., Walpole, ____ ___________________________________________________ supra. _____ Insofar as Kenney speaks to the commands of due process, ______ therefore, we disagree with the district court's conclusion that, "properly interpreted," Kenney stands for the ______ proposition that "witnesses cannot be denied in a disciplinary hearing simply based upon the location of the individual within the prison." McGuinness v. Dubois, 887 F. __________ ______ Supp. at 22. Further, of import is the Kenney court's ______ treatment of Devaney v. Hall, 509 F. Supp. 497 (D. Mass. _______ ____ 1981). In Devaney, the district court held that the "across- _______ the-board" policy of MCI-CJ [then called MCI-Walpole] of permitting only written statements of witnesses in disciplinary hearings held in the DSU [then called Block 10] did not violate due process as it was not arbitrary nor beyond the discretion of prison authorities to adopt. Id. at ___ 500-01. In Kenney, the SJC distinguished Devaney on the ______ _____________ _______ ground that, unlike Devaney, Kenney was not lawfully held in the DSU and reliance on his location as a justification for the denial of witnesses was therefore unreasonable. Kenney ______ v. Commissioner of Correction, 393 Mass. at 35 n.11. If, ___________________________ "properly interpreted," Kenney stands for the proposition ______ that witnesses cannot be denied in a disciplinary hearing simply based upon the location of the individual within the -12- -12- prison, whether lawfully confined in that area or not, then the SJC would not have distinguished Devaney; rather, the SJC _____________ _______ would have expressed disagreement with Devaney's holding. _______ But the SJC did not do that. Although we disagree with the district court's interpretation of "the rule of Kenney," insofar as the ______ district court interprets that rule as speaking to the requirements of federal due process,6 we note that to prohibit live defense witness testimony at a disciplinary hearing, numerous courts have interpreted the due process teachings of the Wolff opinion to require an individualized _____ decision, based on the facts of each case. See, e.g., __________ Mitchell v. Dupnik, 67 F.3d 216, 223 (9th Cir. 1995); Forbes ________ ______ ______ v. Trigg, 976 F.2d 308, 317 (7th Cir. 1992), cert. denied, _____ ____________ 113 S. Ct. 1362 (1993); Ramer v. Kerby, 936 F.2d 1102, 1104 _____ _____ (10th Cir. 1991); King v. Wells, 760 F.2d 89, 93 (6th Cir. ____ _____ 1985); Dalton v. Hutto, 713 F.2d 75, 78 (4th Cir. 1983); ______ _____  ____________________ 6. Similarly, we conclude that neither Guyton v. Dubois, No. ______ ______ 92-1819 (Mass. Super. Ct. July 20, 1992), nor Abrazinski v. __________ Dubois, 876 F. Supp. 313 (D. Mass. 1995), further support any ______ due process determination. Guyton was found to have been unlawfully held in the DSU and thus Guyton is simply a ______ straightforward application of Kenney. The Abrazinski ______ __________ court's discussion of Kenney was dicta and, in any event, for ______ reasons discussed, supra, we disagree with that court's _____ reading of Kenney as holding that "isolation in a segregation ______ unit alone, even if legal, is not sufficient to support a ______________ denial of witnesses." Abrazinski v. Dubois, 876 F. Supp. at __________ ______ 323 (emphasis added). -13- -13- Bartholomew v. Watson, 665 F.2d 915, 918 (9th Cir. 1982)7; ___________ ______ but see Powell v. Coughlin, 953 F.2d 744, 749 (2d Cir. 1991). _______ ______ ________ The Supreme Court, itself, has addressed the validity of an "across-the-board" policy denying witness requests only indirectly. While, in Ponte, it disagreed with the _____ Massachusetts prison officials' contention that "'across-the- board' policies denying witness requests are invariably proper," Ponte v. Real, 471 U.S. at 496, as the Second _____ ____ Circuit has said, the Court "has not ruled that such policies are invariably improper." Powell v. Coughlin, 953 F.2d at ______ ________ 749 (holding that an across-the-board policy barring the testimony of mental health staff in an inmate's presence at prison disciplinary hearings does not violate due process as  ____________________ 7. We note that while the Bartholomew opinion stated that a ___________ blanket proscription against calling certain types of witnesses violated the "suggestion" in Wolff that the _____ decision to deny live witness testimony should be made on a case-by-case analysis of the potential hazards which may flow from the calling of a particular person, Bartholomew v. ___________ Watson, 665 F.2d at 918, later cases, in citing Bartholomew, ______ ___________ have, without comment, transformed this characterization of Wolff's "suggestion" into a requirement. See, e.g., Mitchell _____ _________ ________ v. Dupnik, 67 F.3d at 223. ______ We also note that, apart from Bartholomew, all of the ___________ above-mentioned cases that opine that an across-the-board proscription against live witness testimony violates due process appear distinguishable from the present case in that nothing in those cases suggests that the absolute prohibitions on the calling of any witnesses or certain categories of witnesses were even purported to be based on institutional security. And, in each case cited, including Bartholomew, the across-the-board prohibition extended ___________ ________ prison-wide in an undifferentiated fashion to all ___________ disciplinary hearings. -14- -14- the policy is reasonably based on legitimate penological interests and is not an exaggerated response). Although some particular case in the future may present compelling evidence that MCI-CJ's policy of denying live testimony from inmate witnesses at a disciplinary hearing held in the West Wing violates due process, we leave consideration of such a case where it appears presently to reside -- in the future. We find that, on the facts of this case, the district court erred in concluding that the application of this policy to McGuinness violated his right to due process. McGuinness contends that he was provoked into striking Andrade and that should lessen any penalty imposed. McGuinness concedes that, contrary to the prison rules, he did not inform Officer Treddin in advance about the content of the expected testimony of Justin Holmes and Jack Shea, other than characterizing them as eyewitnesses. Nonetheless, Treddin obtained their affidavits, along with the affidavit of a third inmate, Michael Dowd, whose testimony McGuinness had not previously requested. Treddin concluded that none of the three saw the whole confrontation - a factual determination certainly within his discretion to make and not within a court's competency to overturn. See ___ Superintendent, Mass. Correctional Inst., Walpole, v. Hill, ___________________________________________________ ____ 472 U.S. 445, 454-55 (1985) (holding that procedural due process is satisfied if the decision to revoke good-time -15- -15- credits is supported by "some evidence" in the record, which "does [not] imply that a disciplinary's board's factual findings ... are subject to second-guessing upon review"). The guilty finding was based on the undisputed facts that McGuinness was out of his cell, acting disruptive, and used abusive language and assaulted a staff member. McGuinness was permitted to present his defense, supported by witness affidavits, that he was provoked. He has never suggested what their live testimony would have added, other than that they would have been able to "explain what they saw much better."8 The live testimony of the requested witnesses was denied on the basis of a policy -- the bona fides of which have not been challenged here -- rooted in legitimate institutional security concerns. In these circumstances, the defendants have carried their burden of proving that the denial of live testimony was neither arbitrary nor capricious, see Smith v. Mass. Dept. of ___ _____ ________________ Correction, 936 F.2d 1390, 1399 (1st Cir. 1991), and that __________ Treddin did not clearly abuse his considerable discretion, see Hurney v. Carver, 602 F.2d 993, 995 (1st Cir. 1979), in ___ ______ ______ denying McGuinness' request for the live testimony of Holmes, Shea, and Dowd, even if the denial was based on a general  ____________________ 8. And, it is not certain that even this suggestion was made at the disciplinary hearing so that Treddin could consider it. Rather, on the record before us, this suggestion first appears in McGuinness' written appeal of the disciplinary finding to the prison superintendent. -16- -16- policy of denying live witness testimony in the West Wing. "[S]o long as the reasons are logically related to preventing undue hazards to 'institutional safety or correctional goals,' the explanation should meet the due process requirements as outlined in Wolff." Ponte v. Real, 471 U.S. _____ _____ ____ at 497. IV. The declaratory judgment of May 1, 1995, in favor of plaintiff McGuinness on Count 6 is reversed. As we have ________ concluded that McGuinness' constitutional rights were not violated, the March 15, 1995 order granting summary judgment in favor of defendants Treddin and Duval on Counts 2 and 4 is affirmed. So ordered. No costs. _________ -17- -17-