RICHARD A. KENNEY vs. COMMISSIONER OF CORRECTION
& others.[1]

Norfolk. April 2, 1984. — September 13, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.

*Imprisonment. Administrative Law,* Regulations. *Due Process of Law,*
Prison disciplinary proceeding.

A prisoner's confinement in the segregation unit of a correctional institution,
without a hearing before the prison disciplinary board and without a
finding that he was guilty on the charges against him, violated regulations
of the Department of Correction governing the transfer of prisoners to
the segregation unit. [33-34]

Regulations of the Department of Correction authorizing administrative
segregation of a prisoner in "awaiting action" status and authorizing the
superintendent of a correctional institution to designate "an awaiting
action area" did not authorize a prisoner's transfer to an institution's
segregation unit while he was awaiting action by the prison disciplinary
board on charges that he had committed certain offenses. [34]

A prison disciplinary board violated an inmate's due process rights by deny-
ing his request to have certain witnesses appear at the inmate's disci-
plinary hearing where the board denied the request to call witnesses
because the hearing was held in the prison's segregation unit and where
the inmate's transfer to the segregation unit violated applicable regula-
tions of the Department of Correction. [34-35]

CIVIL ACTION commenced in the Superior Court Department
on July 2, 1982.

The case was heard by *Hiller B. Zobel,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Martin E. Levin,* Assistant Attorney General, for Commis-
sioner of Correction & another.

[1] The superintendent, Massachusetts Correctional Institution at Walpole,
and various correctional officers and inmates. Only the Commissioner and
the superintendent appeal.

*Ann Lambert Greenblatt* for the plaintiff.

LIACOS, J. The plaintiff, Richard A. Kenney, an inmate at the Massachusetts Correctional Institution at Walpole (M.C.I., Walpole), brought this action in the Superior Court seeking damages and declaratory and injunctive relief against certain officials of the Department of Correction (department). In his pro se complaint Kenney claims that he was confined in the Departmental Segregation Unit (D.S.U.) in Block 10 at M.C.I., Walpole, without being afforded the procedural safeguards required by the regulations of the department and the Federal and State Constitutions. He also contends that his right to due process of law was violated by the denial of his request to have certain witnesses appear at his disciplinary hearing.

A judge in the Superior Court, after a hearing on the merits, vacated the findings of the prison's disciplinary board (board) and ordered entry of judgment for Kenney. The judge also ordered that Kenney's record be expunged of any reference to the offenses charged. The defendants appealed and we granted their application for direct appellate review. We affirm.

The facts which give rise to this case are as follows. On January 16, 1981, David Larrabee, an inmate at M.C.I., Walpole, was dragged into a cell and beaten. Two days later another inmate, Stephen M. Haynes, was stabbed during the showing of a movie at the prison. At one time, Larrabee accused Kenney of participating in the assault against him, but Haynes refused to identify his attacker. On March 19, 1981, the Superintendent of M.C.I., Walpole (superintendent), ordered Kenney removed from the general prison population and placed him in a cell in the D.S.U. The judge found that Kenney was confined there under the same conditions as those inmates who had been transferred to the D.S.U. pursuant to a finding by the Commissioner of Correction (Commissioner) that their behavior posed a substantial threat to the residents, property, or operations of the institution.[2] The judge also found that Kenney was usually

---

[2] The department has promulgated regulations governing the procedures under which an inmate may be transferred to a D.S.U. See 103 Code Mass. Regs. § 421.07 (1978). The pertinent regulations are set out in notes 7 & 8, *infra*.

confined to his cell in the D.S.U. for twenty-four hours a day, his exercise periods and visiting hours were restricted, and he was allowed to keep only a minimum of possessions in his cell. Because of these limitations on Kenney's institutional freedom, the judge found that his detention in the D.S.U. was punitive.[3] See *Libby* v. *Commissioner of Correction,* 385 Mass. 421, 423 (1982).

On March 30, 1981, Kenney received two disciplinary reports charging him with assaulting both Larrabee and Haynes.[4] The board conducted a disciplinary hearing on the charges on May 28, 1981.[5] Kenney requested that Larrabee and Haynes be allowed to appear at the hearing as witnesses but the board denied his request, stating: "Board finds substantial risk. D.S.U. off limits to inmates other than those residing there. Board will accept offers of proof and/or affidavits."

At the disciplinary hearing, a correction officer testified that four reliable informants had told him that Kenney and two other inmates had committed the assaults on Larrabee and Haynes. Kenney submitted affidavits from Larrabee and Haynes

[3] Kenney was permitted to have two one-hour "non-contact" visits each week (conducted in a room where the inmate and the visitor were separated by a wire screen). Weather permitting, he was allowed one hour of outdoor exercise three times a week. The exercise area was entirely enclosed by a chain link fence (top and sides) and measured approximately ten feet by thirty-five feet. Kenney was also allowed to shower twice a week. He was not permitted to have a radio or television in his cell but he was allowed to have three changes of clothing, three magazines, legal materials, correspondence, tobacco, and toiletries.

[4] Kenney was charged with committing the following offenses: "(18) Fighting with, assaulting or threatening another person with any offense against his person or property. (31) Attempting to commit any of the above offenses, aiding another person to commit any of the above offenses, and making plans to commit any of the above offenses shall be considered the same as commission of the offense itself." 103 Code Mass. Regs. § 430.22 (18), (31) (1978).

[5] The fifty-nine day interval between the issuance of the disciplinary reports on March 30, 1981, and the hearing on May 28, 1981, is attributable in part to the defendants and in part to Kenney. The hearing was originally scheduled for April 17, 1981, but it was postponed by the defendants until April 29, 1981. Kenney's attorney subsequently requested a continuance and the hearing was rescheduled to May 28, 1981.

stating that Kenney had not participated in the attacks against them. The board found Kenney guilty on all charges and recommended that he serve thirty days in isolation in fifteen-day intervals and referred him to the D.S.U. board for reclassification to a higher custody status. Acting on the referral, the D.S.U. board conducted a hearing and recommended that Kenney be placed in the D.S.U. The Commissioner approved the recommendation on July 10, 1981, and as a result Kenney was officially "placed" in the D.S.U.

On appeal, the defendants contend that the superintendent's initial confinement of Kenney in the D.S.U. was permissible because he was in "awaiting action" status. The defendants assert that as a general rule, as long as the superintendent complies with the procedural requirements of the department's regulations governing awaiting action status, the superintendent may place inmates in the D.S.U. while they await action. With respect to Kenney's claim that his request for witnesses at the disciplinary hearing was improperly denied, the defendants maintain that the board's action was within its discretion.

First we consider whether Kenney's initial confinement in the D.S.U. was in violation of the regulations of the department.[6] The department has promulgated detailed regulations governing disciplinary actions in State correctional institutions, the relevant provisions of which are set out in the margin.[7] A

---

[6] We treat this action as one seeking declaratory relief. *Nelson* v. *Commissioner of Correction,* 390 Mass. 379, 388 & n.12 (1983). See G. L. c. 30A, §§ 1A, 7; G. L. c. 231A, § 2. General Laws c. 231A, § 2, provides that the legality of the administrative practices and procedures of a State agency may be determined in a declaratory judgment action when violations of regulations are "consistently repeated." G. L. c. 231A, § 2. See *Nelson* v. *Commissioner of Correction, supra* at 387 n.11. We assume, in light of the defendants' assertion that the superintendent has the authority to place *any* inmate who is in awaiting action status in the D.S.U., that the superintendent's action in this case has been consistently repeated in similar cases. Cf. *Hill* v. *Superintendent, Mass. Correctional Inst., Walpole,* 392 Mass. 198, 199 n.2 (1984); *Cepulonis* v. *Commissioner of Correction,* 15 Mass. App. Ct. 292, 292 (1983) (treating inmate complaints as civil actions in the nature of certiorari under G. L. c. 249, § 4).

[7] Title 103 Code Mass. Regs. § 430.19 (1978) was promulgated pursuant to G. L. c. 124, §§ 1 (*b*), (*i*), (*q*), and G. L. c. 127, § 33. The regulation pro-

section of the disciplinary action regulations authorizes place-
ment of an inmate in "awaiting action" status pending "[a]
hearing on a disciplinary offense . . . [a]n investigation of a
possible disciplinary offense . . . [a] transfer or reclassification
of the inmate to higher custody status . . . or [i]mposition of
isolation time." 103 Code Mass. Regs. § 430.19(1) (1978).

The department also has adopted a set of regulations govern-
ing segregation units.[8] A related regulation defines an awaiting

---

vides that: "(1) The superintendent or his designee may authorize the place-
ment of an inmate in detention in awaiting action status pending: (a) A
hearing on a disciplinary offense by the inmate; (b) An investigation of a
possible disciplinary offense by the inmate; (c) A transfer or a reclassification
of the inmate to higher custody status, or (d) Imposition of isolation time
sanction on the inmate when the inmate's continued presence in the general
population poses a serious threat to persons, property, or the security of
the institution.

"(2) The superintendent shall designate such person or persons as he
deems appropriate to review the status of inmates housed in detention in
awaiting action on a weekly basis. An inmate shall be released from detention
when the reasons for his initial placement cease to exist or when his return
to general population no longer poses a serious threat to persons, property,
or the security of the institution or when he is no longer in the status
specified in any one of 103 CMR 430.19(1)(a) through 430.19(1)(d) [1978]."

[8] Title 103 Code Mass. Regs. § 421.07, promulgated pursuant to G. L.
c. 124, § 1 (b), (q), and G. L. c. 127, § 39, provides as follows: "(1) A
resident may be transferred to a departmental segregation unit after a finding
by the commissioner that the record of the resident or other reliable infor-
mation indicates that: (a) The resident poses a substantial threat to the safety
of others; or (b) The resident poses a substantial threat of damaging or
destroying property; or (c) The resident poses a substantial threat of inter-
rupting the operation of the state correctional facility if he is confined in
the general population of any state correctional facility.

"(2) Notwithstanding any rule or regulation of the department to the
contrary, a resident shall not be transferred to a departmental segregation
unit for committing a specific punishable offense unless a disciplinary board
has found him guilty of such specific offense and imposed a sanction
pursuant to 103 CMR 430.00 [1978] (Disciplinary Process, Rules and
Regulations), and the commissioner has made a finding in accordance with
103 CMR 421.07(1) [1978]. This shall be the case regardless of whether
the specific punishable offense has been referred to outside law enforcement
agencies for investigation and possible prosecution of the resident.

"(3) Upon receipt of a request from a superintendent to the commissioner
to transfer a resident to a departmental segregation unit, the rules set forth
in 102 CMR 420.13(2) (Guidelines for the Operation of the Reclassification
Process — Intra-Facility and Interfacility), shall be followed in determin-

action area as "[a]n area or areas designated by a superintendent in which a resident may be confined pending a hearing to determine whether such resident shall be transferred to a departmental segregation unit." 103 Code Mass. Regs. § 421.06 (1) (1978). The segregation unit regulations also provide that an inmate may be transferred to a D.S.U. after the Commissioner has found that "[t]he resident poses a substantial threat to the safety of others; or . . . of damaging or destroying property; or . . . of interrupting the operation of the state correctional facility." 103 Code Mass. Regs. § 421.07(1) (1978). Transfer of an inmate to a departmental segregation unit for commission of a disciplinary offense is specifically prohibited unless the inmate has been found guilty by the board, sanctions have been imposed, and the Commissioner has made an appropriate finding. 103 Code Mass. Regs. § 421.07(2) (1978).

A third set of regulations outlines the procedures involved in reclassifying an inmate to a higher custody status. 103 Code Mass. Regs. § 420.13 (1978). These regulations provide for placement of an inmate in awaiting action status when there is an immediate threat to the health or safety of the inmate or others. 103 Code Mass. Regs. § 420.13(2)(b) (1978). The reclassification regulations do not specifically authorize placement of an inmate in awaiting action status in the D.S.U.

Administrative agency regulations promulgated pursuant to a legislative grant of power generally have the force of law. *Royce* v. *Commissioner of Correction,* 390 Mass. 425, 427 (1983). "Once an agency has seen fit to promulgate regulations, it must comply with those regulations." *Id.* Consequently, individuals within the agency may not arbitrarily disregard agency regulations to the prejudice of a party's rights. *Da-Lomba's Case,* 352 Mass. 598, 603 (1967).

In this case, in direct contravention of the segregation unit regulations which govern transfers of inmates to the D.S.U., the superintendent placed Kenney in a D.S.U. cell for commission of specific disciplinary offenses before Kenney had been

ing whether to authorize the transfer of the resident to such unit; except that 103 CMR 420.13(2)(o) shall not be applicable."

found guilty, before sanctions had been imposed, and before the Commissioner had found that Kenney posed a substantial threat to the institution. See 103 Code Mass. Regs. § 421.07(2) (1978). The attempt to justify this action by claiming that Kenney was in awaiting action status must fail because the regulatory definition of an awaiting action area does not contemplate the use of the D.S.U. for inmates who are awaiting action. That definition limits awaiting action areas to those areas where an inmate "may be confined *pending a hearing to determine whether* [*he should*] *be transferred to a departmental segregation unit*" (emphasis supplied). 103 Code Mass. Regs. § 421.06 (1978).[9]

Our decision in *Royce* v. *Commissioner of Correction, supra,* does not require a different result. In *Royce,* in order to determine whether the plaintiff had stated a claim (the case came to us on appeal from the dismissal of the complaint), we assumed on a limited record that the plaintiff could have been placed in the D.S.U. while he was awaiting action pursuant to the reclassification regulations. *Id.* at 429. We specifically stated in *Royce* that we did not decide whether the regulations provided for "any limitation of the superintendent's discretion to designate 'awaiting action' areas." *Id.* at 429 n.8. We agree with the judge's conclusion that an inmate may be transferred (or placed) in the D.S.U. by the Commissioner only in compliance with the regulations. 103 Code Mass. Regs. § 420.13 (2)(b); § 421.07 (1978). The record of this case indicates that Kenney was placed in the D.S.U. without compliance with the governing regulations and therefore we conclude that his confinement in the D.S.U. in awaiting action status was contrary to law.

We turn next to Kenney's claim that his due process rights were violated by the board's denial of his request to call certain witnesses. Under Federal law, there is a limited right to call witnesses at prison disciplinary proceedings. *Wolff* v. *McDonnell,* 418 U.S. 539, 566 (1974). This right to call witnesses

---

[9] In their brief, the defendants argue that an inmate may be placed or detained in the D.S.U. in awaiting action status consistent with the regulations governing segregation units because those regulations apply only to formal "transfers" to the D.S.U. by the Commissioner. See 103 Code Mass. Regs. § 420.07 (1978). The argument borders on the spurious and we reject it.

and present defenses is also included in the regulations. 103 Code Mass. Regs. § 430.14(6) (1978). We have held that, in order to render this right meaningful, due process requires that the administrative record contain some support to justify a denial of the right to call witnesses. *Real* v. *Superintendent, Mass. Correctional Inst., Walpole*, 390 Mass. 399, 407 (1983). We are aware, however, that "[t]he operation of a correctional institution is at best an extraordinarily difficult undertaking" and, therefore, we have recognized that prison administrators have broad discretion in the administration of prison affairs. *Id*. at 406, quoting *Wolff* v. *McDonnell, supra* at 566. Such discretion, however, is not unlimited. *Id*.

The record in this case indicates that the board denied the request to call witnesses because the disciplinary hearing was held in the D.S.U. The board found that allowing inmates into the D.S.U. who were not D.S.U. residents created a "substantial risk." We have determined, however, that Kenney's initial placement in the D.S.U. was in violation of the regulations of the department.[10] It is therefore axiomatic that the defendants may not rely on Kenney's illegal incarceration in the D.S.U. as the justification for the denial of his request to call witnesses. Also, the judge found that no applicable regulation barred inmate witnesses from the D.S.U. area, and that the D.S.U. at M.C.I., Walpole had a secure visitation area in which the safety of witnesses could be assured. We hold, therefore, that the judge correctly ruled that the board's denial of Kenney's request to call witnesses violated his due process rights, as well as the regulatory requirements.[11]

---

[10] Our disposition of this case makes it unnecessary for us to address the other issues raised by the parties.

[11] The defendants' reliance on *Devaney* v. *Hall*, 509 F. Supp. 497 (D. Mass. 1981), is misplaced. The plaintiff in *Devaney* sought monetary damages under 42 U.S.C. § 1983 (1976 & Supp. III 1979) and G. L. c. 127, § 32, alleging that the defendants had improperly placed him in protective custody in the D.S.U. at M.C.I., Walpole. *Id*. at 498. The judge held that where the transfer was made in good faith, and in conformance with the law as it stood at that time, the defendants were entitled to summary judgment. *Id*. at 502-503. Cf. *Blaney* v. *Commissioner of Correction*, 374 Mass. 337, 340 (1978) (Block 10 no longer used for protective custody). The judge

The judge declared the rights of the parties and fashioned a remedy which included an order to expunge Kenney's record of any reference to these disciplinary offenses. We cannot say in the circumstances of this case that this relief was incorrect. Kenney had already been confined to the D.S.U. and served some of his isolation sentence by the time this case was heard by the judge. The remedy, therefore, was not inappropriate.

*Judgment affirmed.*

also held, on the assumption that the plaintiff in *Devaney* was properly in the D.S.U., that the defendants' policy of refusing to allow inmate witnesses to testify at disciplinary hearings held in the D.S.U. was reasonably justified. *Id.* at 500. We have concluded, however, that Kenney's placement in the D.S.U. was illegal and that reliance on his location as a justification for the denial of witnesses was therefore unreasonable.