**Brendan M. McGUINNESS, Plaintiff,**

v.

**Larry E. DUBOIS, Commissioner of the Massachusetts Department of Corrections; Michael T. Maloney, Deputy Commissioner; Jeffrey Sherwin, Special Hearing Officer; Ronald Bissonnette, Sergeant at M.C.I. Cedar Junction at Walpole; all both in their personal capacities as individuals and also in their official capacities, Defendants.**

**Civ. A. No. 93–11921–WGY.**

United States District Court,
D. Massachusetts.

June 19, 1995.

---

Brendan McGuinness, Walpole, MA, pro se.

William D. Saltzman, Dept. of Correction, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

Brendan M. McGuinness ("McGuinness"), a frequent litigant in this Court,[1] is a prisoner currently incarcerated at the Massachusetts Correctional Institution at Cedar Junction ("MCI–Cedar Junction") serving a twenty-year sentence for armed robbery. This consolidated action comprises two separate cases in which McGuinness asserts causes of action under 42 U.S.C. § 1983. In the first case (Civil Action No. 93–10490), McGuinness alleges that his placement in a Departmental Disciplinary Unit ("DDU") violated Mass. Gen.Laws Ann. ch. 127, §§ 39, 40. The second case (Civil Action No. 93–11921) involves claims arising from several altercations with prison guards.

### I. Civil Action No. 93–10490

In April of 1992, McGuinness was convicted at a prison disciplinary hearing of attempting to flush his sweatshirt down the toilet and sentenced to the DDU. He resided in the DDU from May 13, 1992 to November 6, 1992. While in DDU, McGuinness instigated this suit challenging the conditions and duration of his DDU confinement. After a rather tortuous path, including a trip to the First Circuit, the issue presented has nar-

---

1. *See McGuinness v. Cannone*, No. 94–10515–WGY (D.Mass. filed Feb. 24, 1994) (dismissed § 1983 action); *McGuinness v. Duval*, No. 94–11315–NG (D.Mass. filed June 29, 1994) (pending habeas petition); *McGuinness v. DuBois*, No. 93–11800–JLT (D.Mass. filed Aug. 17, 1993) (dismissed habeas petition); *McGuinness v. DuBois*, No. 93–12673–WGY (D.Mass. filed Nov. 29, 1993) (§ 1983 and declaratory judgment action decided in McGuinness' favor).

rowed to the following: do Massachusetts Regulations authorizing sentences to DDU as a disciplinary sanction for a period up to ten years violate Mass.Gen.Laws ch. 127, §§ 39, 40? [2]

The Court is not without guidance on this question, having once before granted the defendants summary judgment in a previous phase of this litigation. On May 11, 1994, the First Circuit affirmed, holding, *inter alia,* that an "isolation unit" under section 40 is simply "not the same" as the DDU. *McGuinness v. DuBois,* Nos. 93–2048, 94–1142, slip op. at 12 (1st Cir. May 11, 1994). The Court of Appeals noted that the disciplinary proceeding regulations themselves treated the two distinctly, and credited the following averments in the affidavit of Deputy Commissioner Michael T. Maloney:

> The conditions in the DDU are not as severe as those that prevail in an "isolation unit" in the Massachusetts Department of Correction.
>
> An inmate in isolation is never allowed a television or radio. For fifteen days at a time, he is deprived of all out-of-cell activity and deprived of all outside contact or stimulus with the exception of a Bible or other holy book.
>
> By contrast, DDU inmates can communicate with other inmates one hour per day, five hours per week during their exercise periods. Pending good behavior, they can have telephone calls, visits and a television and radio.

*Id.* at 12–13. The Court of Appeals also held that the first thirty days in DDU, in which inmates are not allowed visitors, access to a telephone, or radios did not violate section 40. Although "isolating," those conditions did not amount to "isolation" because of the remaining advantages of DDU over isolation (e.g., daily out-of-cell exercise, access to reading and legal research materials). *Id.* at 14.

On May 17, 1994, the Department's attorney notified the First Circuit of an error in the affidavit of Deputy Commissioner Maloney quoted in its recently issued opinion. Apparently, prisoners in isolation are deprived of all out-of-cell activity at only one of the Department's facilities, the Old Colony Correctional Center. Thus, conditions of isolation at MCI–Cedar Junction are not as harsh as the Department had led this Court and the First Circuit to believe. In response, the First Circuit vacated its judgment, withdrew its opinion, vacated this Court's summary judgment, and remanded for further consideration, stating:

> The defendants may be entitled to summary judgment on this issue, nonetheless. We are unable to determine this on the basis of the (now concededly inaccurate) record. We think it best for the district court to explore whether, and, if so, how, conditions imposed on an inmate serving an isolation sanction differ from conditions imposed on an inmate in the DDU (particularly for the first 30 days of a DDU term.) (sic)

*McGuinness v. DuBois,* Nos. 93–2048, 94–1142, slip op. at 2 (1st Cir. June 7, 1994).

The Department's prompt and ethical correction of its erroneous affidavit does not

---

2. Those statutes provide:

> At the request of the superintendent of any correctional institution of the commonwealth, the commissioner may authorize the transfer, for such period as he may determine, to a segregated unit within any correctional institution of the commonwealth, of any inmate whose continued retention in the general institution population is detrimental to the program of the institution.
>
> Such segregated unit shall provide regular meals, fully furnished cells, limited recreational facilities, rights of visitation and communication by those properly authorized, and such other privileges as may be established by the commissioner. Under the supervision of the department of mental health, all inmates confined to a segregated unit shall be given periodic medical and psychiatric examinations, and shall receive such medical and psychiatric treatment as may be indicated.

MASS.GEN.LAWS ANN. ch. 127, § 39 (West 1991).

> For the enforcement of discipline, an inmate in any correctional institution of the commonwealth may, at the discretion of its superintendent, be confined for a period not to exceed fifteen days for any one offence, to an isolation unit.
>
> Such isolation units must provide light, ventilation and adequate sanitary facilities, may contain a minimum of furniture, and shall provide at least one full meal daily.

MASS.GEN.LAWS ANN ch. 127, § 340 (West 1991).

alter the earlier conclusion reached in this case: isolation and DDU are distinct forms of incarceration authorized by statute. McGuinness has not rebutted the differences in privileges afforded inmates in the two settings, and the Court rules them sufficient to preclude a determination that DDU is merely extended isolation by another name. The Court finds additional support in a recent decision in the Massachusetts Superior Court by Justice George A. O'Toole, Jr. *See MacDougall v. DuBois*, No. 93–3032–D, slip op. at 2–3 (Mass.Super.Ct. June 27, 1994) (O'Toole, J.) (holding "it is clear that D.D.U. inmates are not subject to conditions which amount to isolation"). The same applies to the first thirty days in DDU, in which privileges are somewhat curtailed but remain in excess of those afforded inmates in isolation. Although institutional labels, especially those affixed by the Department of Corrections, must be closely scrutinized, see *Longval v. Commissioner of Correction*, 404 Mass. 325, 328–29, 535 N.E.2d 588 (1989) (department may not avoid its obligations by assigning pretextual names to units), the conditions and duration of McGuinness' confinement to DDU pursuant to departmental regulations were lawful and did not "impermissibly conflict" with the statutory scheme of sections 39 and 40.

## II. Civil Action No. 93–11921

The second case arises out of a series of events beginning with a minor confrontation with a prison guard on February 2, 1993, and ending with McGuinness' conviction and sentence to DDU on April 21, 1993 following a disciplinary hearing. McGuinness claims that Sergeant Ronald Bissonnette ("Bissonnette") assaulted him in violation of state law and the Eighth Amendment (Count I);[3] that the hearing officer, Jeffrey Sherwin ("Sherwin"), violated McGuinness' right to due process through his conduct of the hearing (Count II); that Commissioner DuBois and Deputy Commissioner Michael T. Maloney ("Maloney") failed adequately to train and supervise the other defendants (Count III);

that the sanctions received were unconstitutional (Count IV); that his prolonged confinement in DDU caused irreparable harm to his mind and body in violation of the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article 12 of the Declaration of Rights of the Massachusetts Constitution (Count V); and that the deprivation while in DDU of educational and other "reformatory" opportunities violated the terms of his confinement as well as a "state created liberty interest" in those opportunities under the federal and state constitutions (Count VI).

On May 23, 1994, McGuinness moved for partial summary judgment on Count VI. The Department of Correction ("Department") filed a cross-motion for partial summary judgment on Counts II and VI. The Department further moved to dismiss without prejudice or to stay this action pending resolution of a state court proceeding involving other inmates but some of the same issues presented here. *See Torres v. DuBois*, No. 94–0270–E (Mass.Super.Ct. filed Jan. 18, 1994). The Court granted the motion to stay on February 14, 1995, but lifted it upon McGuinness' request on April 7, 1995. Lifting the stay reinstates the cross motions for partial summary judgment which the Court addresses herein.

### A. Background

Consistent with the duty to draw all inferences in favor of the non-movant, see *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir.1995), the Court recites the facts from McGuinness' point of view as it is Count II that is crucial here and on that count, McGuinness is the non-movant. The Court naturally expresses no opinion concerning the accuracy vel non of these allegations.

#### 1. The February 2 Incident

On February 2, 1993, while housed in an "awaiting action" unit, McGuinness became upset and lit a fire to attract the attention of the guards.[4] An unidentified guard arrived and asked what the problem was; McGuin-

---

**3.** McGuinness voluntarily dismissed his assault claim on April 7, 1995.

**4.** The record does not reveal whether McGuinness had at his disposal any alternative, and perhaps less disruptive, method of communicating with prison officials.

ness informed him that he had just received word that a loved one was in the hospital, and he requested to use the phone. The guard laughed in McGuinness' face and said, "What am I, an operator?" Seized with rage, McGuinness reached through the bars and pushed the guard's face away from the cell.

McGuinness was later handcuffed and moved to the Health Services Unit. At some point he was told to put his still-cuffed hands behind him, apparently in anticipation of being moved to another cell. He asked where he was going, but received no answer and refused to leave the cell. Minutes later, a guard came and opened the door and a group of guards, led by Bissonnette, entered his cell, beat him, stripped him naked, and left him unclothed in a "security cell" until the next morning. He was returned to a new cell in the awaiting action unit the next day.

## 2. The February 9 Incident

McGuinness' next encounter with Bissonnette allegedly occurred a week later, on February 9, 1993. McGuinness had a visitor from early afternoon until approximately 8:30 p.m., and was then escorted back to his cellblock by Bissonnette. As they approached the "trap," an area between two locked doors through which one must pass to enter the awaiting action block, McGuinness told Bissonnette that he was "disappointed" by his actions the previous week. Bissonnette asked why, and McGuinness said, "Because I heard you would give a man a fair beef." Bissonnette responded, "I do, why? Do you want one?" McGuinness said, "Absolutely." Bissonnette then motioned for McGuinness to step into the trap, and he did so, thinking that he and Bissonnette would settle their differences by fighting in a broom closet. McGuinness walked up to the second locked door and waited to be "buzzed" in by another guard in the cage, but instead, while looking over his shoulder, was punched unexpectedly in the face by Bissonnette.

The two men traded punches for a short period, and Bissonnette told the guard in the cage to call for help, which he did. When several guards responded to the call, the punching portion of the fight had apparently come to an end, as the combatants had each other in a "wrestling hold." Bissonnette ordered the seven to ten other guards to hit McGuinness; they complied and beat McGuinness while he attempted to defend himself. After a few minutes, McGuinness relented, hoping they would shackle him and take him away, but after putting on restraints, a guard "stomped" on the back of his head and he was kicked, punched and assaulted for around thirty more seconds. The guards then picked him up and carried him off for medical treatment, dropping him on his face numerous times along the way. That night, McGuinness was taken directly to a section of the lower tier of the West Wing Segregation Unit ("WWSU"), denominated an awaiting action unit by prison officials.

## 3. The Aftermath

McGuinness was charged with violating a departmental rule or regulation; disruptive conduct; fighting; and attempting to commit those offenses. At his disciplinary hearing on April 7, 1993, McGuinness requested nine witnesses: seven inmates; an eyewitness to the altercation, Officer Gillette ("Gillette"); and the officer who conducted the investigation of the February 9 incident. The Hearing Officer, Sherwin, denied that request. With one exception, Sherwin denied the inmate witnesses because the witnesses were "not allowed into WWSU per 103 CMR 430.14(4)(C)." Sherwin further stated that Gillette would not be called because he had just recently been assaulted. Sherwin gave no reason for denying the presence of the investigating officer. McGuinness obtained affidavits from two of the seven inmates. Sherwin promised to obtain affidavits from Gillette as well as the other proposed witnesses. Sherwin only obtained one affidavit, that of inmate Steven Berry ("Berry"), and this after the hearing. According to his "Statement of Evidence Relied Upon," Sherwin also considered the "in-camera" testimony of Bissonnette. McGuinness did not see Berry's affidavit until after he had been found guilty.

At the hearing, in order to illuminate the origins of the February 9 dispute, Sherwin allowed McGuinness to discuss the events of February 2 and Bissonnette's involvement in what McGuinness characterizes as his "illegal forced move" to the DDU. Sherwin would

not, however, allow McGuinness to ask Bissonnette about that issue.

On April 21, 1993, McGuinness received the verdict: Sherwin found him guilty of disruptive conduct and fighting. He was sentenced to nineteen months in the DDU and loss of ninety days of good-time credits. McGuinness submitted an appeal to the Disciplinary Office on May 10, 1993, but received a copy of a letter on May 25, 1993 from Deputy Commissioner Maloney to Superintendent Duval stating that Maloney had not received any appeal and was upholding the verdict and sanctions.

At the time the complaint was filed, McGuinness was serving his nineteen-month sentence to the DDU. In the DDU, McGuinness has not had access to any educational, vocational, or other training opportunities.

## B. Discussion

### 1. Count II

McGuinness claims the following alleged infirmities in his disciplinary hearing, each of which he claims violated his right to due process:

1) Sherwin's refusal to allow McGuinness to question Bissonnette on the first incident; and

2) Sherwin's denial of the witnesses McGuinness wished to call;

3) Sherwin's consideration of Bissonnette's "in-camera" testimony and the Berry affidavit, as well as his failure to obtain an affidavit from Gillette.

The Court addresses each of these allegations in turn.

### a. Cross–Examination of Bissonnette

■ As noted, Sherwin allowed McGuinness to testify regarding the February 2 incident in order to put the February 9 incident into context, but refused to allow McGuinness to question Bissonnette on the earlier altercation. In his report, Sherwin stated that "although not normally allowed," he had permitted the discussion of February 2, which was McGuinness' "justification for challenging [Bissonnette] to a fight." Sherwin was not obligated to consider matters other than the particular incident at issue, and did not abuse his discretion in the conduct of the hearing by limiting such evidence to McGuinness' testimony.

### b. Denial of Witnesses

The denial of witnesses at prison disciplinary hearings is a common subject of litigation here and in the courts of the Commonwealth. The presentation of evidence at such hearings is governed by 103 C.M.R. § 430.14, which states in part:

The inmate shall be allowed to call and question witnesses in his defense, or to present other evidence, when permitting him to do so will not be unduly hazardous to personal safety, institutional safety or correctional goals. The factors that the hearing officer may consider when ruling on an inmate's request to call witnesses, questioning of witnesses, or offer of other documentary or physical evidence shall include, but shall not be limited to, the following:

(a) Relevance;

(b) Whether the evidence is cumulative or repetitive;

(c) Hazards presented by an individual case;

(d) Unavailability of the reporting staff person or other staff person for a prolonged period of time due to illness, vacation or other authorized absence, or for other good cause;

(e) Failure of the inmate to provide a summary of the expected testimony of a proposed witness.

103 C.M.R. § 430.14(4) (1993).

■ The Massachusetts Supreme Judicial Court has held that this regulation implicates the liberty interests of inmates and that a hearing officer may not deny witnesses based solely upon an inmate's unlawful placement in a segregation unit. *Kenney v. Commissioner of Correction*, 393 Mass. 28, 35, 468 N.E.2d 616 (1984). Nor may witnesses be denied based solely upon an inmate's location in a particular area of the prison. *Id.*; *McGuinness v. Dubois*, 887 F.Supp. 20, 22 (D.Mass.1995); *Abrazinski v. DuBois*, 876 F.Supp. 313, 323 (D.Mass.1995) (Tauro, C.J.)

(stating that the *Kenney* court "found that isolation in a segregation unit alone, even if legal, is not sufficient to support a denial of witnesses"); *Guyton v. DuBois,* No. 92–1819, slip op. (Mass.Super.Ct. Jul. 20, 1992) (King, J.). The defendants' reliance on *Devaney v. Hall,* 509 F.Supp. 497, 500–501 (D.Mass.1981) (Garrity, J.), which upheld an "across the board" policy of permitting only written statements in disciplinary hearings held in Block 10 (currently the WWSU), is misplaced; that case antedates the Supreme Judicial Court's decision in *Kenney.* Furthermore, *Devaney* addressed the question whether such a policy violated the inmate's procedural due process rights under *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and *Hurney v. Carver,* 602 F.2d 993 (1st Cir.1979), holding the policy neither arbitrary nor unjustified by concerns for institutional security. 509 F.Supp. at 500. It did not address, as the Court must here, the due process rights of an inmate under Massachusetts' prison regulations in light of *Kenney* and its progeny.

■ McGuinness alleges that Cell 20, the cell to which he was transferred on the lower tier of the WWSU, was a segregation unit, and not an awaiting action unit, to which he could not lawfully be sent unless and until he has been found guilty of a disciplinary offense, sanctions have been imposed, and appropriate findings made by the Commissioner. *See* 103 C.M.R. § 421.07(2) (1994).

The defendants aver, through the affidavit of Superintendent Duval, the following history of the WWSU. Formerly known as Block 10, the WWSU was divided in September of 1985 into two separate units: the lower tiers remained part of the DSU, and the upper tiers were designated as a secure awaiting action unit. This designation occurred because of the need for short-term placement of inmates who must temporarily be removed from the general population pending administrative action. Over time, the need for DSU beds decreased and the need for awaiting action beds increased, so Commissioner DuBois reclassified the lower-right tier of the WWSU from DSU to awaiting action in September of 1992. Inmates in awaiting action may keep their own clothing; DSU inmates must wear jumpsuits. Awaiting action inmates are allowed four telephone calls and four visits per week, whereas DSU inmates are allowed only three of each.

■ The Court agrees with the defendants that Cell 20 is within an awaiting action unit, and is not a DSU under another name. *See McGuinness v. Dubois,* 887 F.Supp. 20, 22–23 (D.Mass.1995); *Smith v. Superintendent, Massachusetts Correctional Inst., Cedar Junction,* 29 Mass.App.Ct. 1112, 563 N.E.2d 257 (1990); *Wilson v. Vose,* No. 89–5579, slip op. at 6–7 (Mass.Super.Ct. Nov. 23, 1992); Affidavit of Ronald T. Duval ¶¶ 2–4. That does not, however, end the inquiry and compel the entry of summary judgment on the defendants' behalf. Under *Kenney* and *Guyton,* mere placement in a unit, even if lawful, is insufficient grounds for denying an inmate's request for witnesses absent a particularized finding that the denial of witnesses is appropriate for the individual inmate charged with an offense. *See McGuinness,* 887 F.Supp. at 22; *Abrazinski,* 876 F.Supp. at 323; 103 C.M.R. § 430.14(4)(c) (factors to be considered shall include "[h]azards presented by an individual case"). The question is therefore whether such findings were made in the case now before the Court.

■ Sherwin's report indicates that he denied each of the requested inmate witnesses but one because they were "not allowed into WWSU per 103 CMR 430.14(4C)." This is consistent with the Court's finding of an institutional policy at MCI–Cedar Junction to deny all requests for general population witnesses to testify at disciplinary hearings held in the WWSU. *See McGuinness,* 887 F.Supp. at 22. Three of those inmates submitted affidavits; one refused to submit an affidavit. The presence of one witness, Rodney Jackson, was denied because he was no longer at MCI–Cedar Junction. Sherwin did not at the time note any concerns relating to any of the other specific individuals involved, nor has he submitted an affidavit professing to have based his denial, even in part, on the specific facts before him. With the exception of Jackson, therefore, the denials were improper and there is therefore no genuine issue of material fact but that they denied

McGuinness his rights under the regulations.[5]

 As to the requested officers, Sherwin noted that (1) Officer Gillette was "denied per 103 CMR 430.14(4C) officer injured in line of duty, just prior to hearing and was unavailable," and (2) that the investigating officer was "denied per 103 CMR 430.14(4A) not a witness to incident." Sherwin's denial of the testimony of the investigating officer was a proper exercise of his discretion, as McGuinness failed to demonstrate its relevance, but his treatment of the request of Gillette deserves closer scrutiny. Gillette apparently witnessed but did not participate in the February 9 fisticuffs. McGuinness informed Sherwin that Gillette would testify that the officer saw McGuinness "step into the AA Block trap, turn around to continue talking to Sgt. Bissonnette, and get punched in the face 2 times before defending [himself]." Such testimony, elicited from a prison officer, would have strongly corroborated McGuinness' defense. Under the regulations, a request for the testimony of a staff person may be denied due to unavailability "for a prolonged period of time due to illness ... or for other good cause." 103 C.M.R. 430.14(4)(d) (1994). Here there is no indication that Gillette's injury was for a prolonged period making postponement of the hearing impracticable. Furthermore, McGuinness has put forth unrebutted evidence, through the affidavit of a fellow inmate, Ricardo Ocasio, that the alleged injury to Gillette did not render the officer unavailable. Ocasio avers the following:

> On 4–7–93, I was housed in the Awaiting Action Block ... at M..I. Cedar Junction in Walpole. On this date i recieved [sic] a major ticket for throwing a tray of spaghetti against my bars, splashing the sauce on the bars and on a prison guard, C.O. Gillette. . . . I saw C.O. Gillette going back into population with a new set of clothing which he had changed into. It was quite obvious that C.O. Gillette never left work as a result of the "assault" with the spaghetti sauce. He merely changed his clothing and returned to his duties in the A.A. Block. I witnessed C.O. Gillette return to work no more than 20–minutes after the "assault" with spaghetti sauce.

Affidavit of Ricardo Ocasio ¶¶ 1–5. On this record, the Court may not rule that the denial of McGuinness' request to call Gillette and Sherwin's refusal to postpone the hearing to accommodate Gillette was proper. McGuinness is therefore entitled to summary judgment on Count II.[6]

### c. Miscellaneous Issues

Sherwin stated in his report that he relied in part on Bissonnette's "in-camera" testimony. From this, McGuinness deduces that Bissonnette provided testimony outside of McGuinness' presence, in addition to his testimony at the hearing. After all, the phrase "in camera" in reference to judicial or quasi-judicial administrative proceedings usually means in chambers or in private. *See* BLACK'S LAW DICTIONARY 760 (6th ed. 1990). The defendants counter that McGuinness is "capitalizing" on Sherwin's "obvious misuse" of the term "in camera" where the record demonstrates that no evidence was received from Bissonnette apart from his testimony in McGuinness' presence.

The Court disagrees with the defendants' implication that McGuinness unfairly seized upon the phrase "in camera" and contorted it to his own advantage. Rather, given his

---

5. This is not to say that Sherwin was required to allow all of McGuinness' witnesses to testify. Nor must he have made specific findings regarding the difficulties attendant upon allowing each of the requested witnesses into the WWSU. McGuinness' summary of anticipated testimony indicated a high degree of redundancy, and therefore Sherwin could have disallowed many of the proposed witnesses on those grounds pursuant to 103 C.M.R. § 430.14(4)(b). He did not do so, but rather relied improperly on the institutional policy of mandatory exclusion.

6. Although McGuinness did not move for summary judgment, this Court is empowered to grant it *sua sponte* as long as the losing parties— the defendants here—were on notice that they had to come forward with all of their evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Andrews v. DuBois,* 888 F.Supp. 213, 220 (D.Mass. 1995). Here, the defendants came forward with their evidence in their own request for summary judgment, and by so entering the fray have left themselves open to the appropriate entry of summary judgment against them.

knowledge of legal argot, McGuinness reasonably and properly interpreted the phrase as an indication that Sherwin relied on evidence other than that introduced at the hearing, an occurrence (if true) otherwise unknowable to McGuinness. Second, the defendants claim that the burden is on McGuinness to allege facts sufficient to support the conclusion that such evidence was relied upon, and that he has not met that burden. They are in error. The language in Sherwin's report is sufficient; the Court will not lightly disregard the use of a legal term of art by a quasi-judicial officer in the course of his duties. The burden shifted to the defendants to demonstrate, through affidavit or otherwise, that no such contacts between Sherwin and Bissonnette occurred and influenced Sherwin's decision. As no such evidence appears in the record, the Court would allow McGuinness to attempt to prove that Sherwin improperly received and relied upon evidence in violation of McGuinness' right to due process.

■ Sherwin did not, however, abuse his discretion by receiving and relying upon the Berry affidavit after the hearing and without McGuinness' knowledge. McGuinness had requested that Sherwin obtain affidavits from the denied witnesses, and had no right to view the affidavits prior to Sherwin's decision.

■ Finally, McGuinness claims that Sherwin's refusal to call Gillette based on his alleged unavailability, combined with an allegedly broken promise to obtain an affidavit from Gillette, violated his right to due process. Assuming that Gillette would have testified favorably to McGuinness, either in person or by affidavit, such evidence coming from a source likely to be credited by a hearing officer would have been crucial to McGuinness' defense to the charges against him. Therefore, given the circumstances surrounding Gillette's absence as detailed above, McGuinness' right to procedural due process was violated by Sherwin's refusal or inability to receive evidence from that officer in any form.

For the above reasons, the defendants' motion for summary judgment on Count II must be denied. The Court *sua sponte*

grants summary judgment on Count II to McGuinness. The defendants may not be held personally liable, however, as they are entitled to qualified immunity. See the discussion of Count III, *infra.*

### 2. Count III

■ Count III alleges that Commissioner DuBois and Deputy Commissioner Maloney failed in their duty adequately to train and supervise the other defendants. Although the defendants have not moved for summary judgment on this count, the Court has determined *sua sponte* that the claim may not proceed, subject to some demonstration by McGuinness, made within sixty days of the date of this order, that a genuine issue of material fact exists with respect to this aspect of the case.

■ Liability under 42 U.S.C. section 1983 may generally not be premised on a theory of respondeat superior. *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). Supervisors of state employees may be liable under a "failure to train" theory, however, where such failure "amounts to deliberate indifference to the rights" of those with whom they come into contact. *Id.* Such "deliberate indifference" must result from conscious choice by the policymaker—"proof that the policymakers deliberately chose a training program which would prove inadequate." *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Mere negligence is insufficient; reckless or callous indifference is required for supervisor liability to attach. *Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 91 (1st Cir. 1994); *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 562 (1st Cir.1989). The First Circuit has recently explained:

[T]he analysis employed to determine whether an official is entitled to summary judgment is quite generous. A reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability. . . . [T]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly

incompetent or those who knowingly violate the law.

*Lowinger v. Broderick,* 50 F.3d 61, 65 (1st Cir.1995) (citations and internal quotations omitted).

Applying these principles to this case, and considering the state of the law as known to the defendants at the time of their actions or omissions, the Court finds that there is no genuine issue of material fact but that DuBois and Maloney are, on this record, entitled to qualified immunity and to entry of summary judgment in their favor on Count III.

### 3. Count VI

■ In Count VI, McGuinness claims that he has a "state created liberty interest," grounded in Mass.Gen.Laws ch. 127, section 48, to reformatory and educational opportunities, and that he was unlawfully deprived of those opportunities while residing in the DDU. Inmates in the DDU are prohibited from participating in any educational programs or activities. The statute orders the Commissioner of Correction to establish and maintain "education, training and employment programs for persons committed to [its] custody." Mass.Gen.Laws Ann. ch. 127, § 48 (West 1991).

McGuinness correctly asserts that the provision "amount[s] to an entitlement, the deprivation of which implicates due process considerations." *Association for Reduction of Violence v. Hall,* 558 F.Supp. 661, 663 (D.Mass.1983) (McNaught, J.), *vacated on other grounds,* 734 F.2d 63 (1st Cir.1984). The Department argues that the statute does not entitle prisoners to uninterrupted educational programs under all circumstances, and that McGuinness' loss of access is but one element of the disciplinary sanctions imposed upon him. These assertions, while sound, are based on the assumption, hotly disputed here, that McGuinness was lawfully

placed in the DDU. The state can, of course, deny an inmate a state-created liberty or property interest once it has afforded the requisite due process. Therefore, Count VI is contingent upon whether McGuinness's disciplinary hearing and conviction, resulting in, *inter alia,* his loss of access to educational programs, comported with due process. As the Court herein has found that McGuinness' due process rights were violated, it necessarily follows that he was unlawfully deprived of his entitlement to educational programs. His motion for partial summary judgment on Count VI must therefore be granted. However, as McGuinness is no longer serving the DDU sentence imposed following his conviction, and the defendants are entitled to qualified immunity, see *supra,* McGuinness is not entitled to any relief on this claim.[7]

### III. Conclusion

As to No. 93–10490, summary judgment is hereby granted to the defendants.

As to No. 93–11921, the defendants' motion for partial summary judgment on Counts II and VI is denied. McGuinness' motion for partial summary judgment on Count VI is allowed. McGuinness is not, however, entitled to any relief under Count VI. The Court *sua sponte* grants summary judgment to the defendants on Count III on the grounds of qualified immunity, subject to some demonstration by McGuinness within sixty days that there is a genuine issue of material fact with respect to this aspect of the case.

Further, while McGuinness is, apparently, no longer confined in DDU on any of the disciplinary charges discussed herein, since it is beyond dispute that the refusal to call his witnesses was based on an institutional policy and not on a particularized determination, summary judgment is hereby granted to McGuinness on Count II. The conviction following the defective hearing is therefore

---

7. McGuinness argues in the alternative that his receipt of a "reformatory" sentence to MCI–Concord instead of a "punitive" sentence to MCI–Cedar Junction guarantees access to "reformatory opportunities" throughout his confinement. In McGuinness' own words:

It is not plaintiff's contention the defendant's [sic] can not confine him at Walpole on his

"reformatory" sentence; but whether he is transferred to Walpole or Belfast, he must be afforded the opportunity to "reform" himself in accordance with "the terms of (his) sentence."

Amended Complaint at 3. Be that as it may, the Court agrees with the Department that the argument is without merit.

void and of no effect, and the determination is set aside without prejudice to a rehearing. That determination may play no part whatsoever in any further classification, penal, disciplinary, or release decisions with respect to McGuinness.

It is so ordered.